NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241041-U

NO. 4-24-1041

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| MARQUIS COSTIC, | ) | No. 13CF318 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine S. Gorman, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Lannerd and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed in part and reversed in part the trial court's order
dismissing defendant's postconviction petition at the second stage of
postconviction proceedings where defendant made a substantial showing of actual
innocence and ineffective assistance of trial counsel for failing to interview and
subpoena an alibi witness but failed to make a substantial showing of unreasonable
assistance of postconviction counsel or ineffective assistance of trial counsel for
failing to interview and subpoena other potential witnesses, request a continuance,
or impeach a State witness.

¶ 2    In 2013, defendant, MarQuis Costic, was charged with first degree murder (720

ILCS 5/9-1(a)(2) (West 2012)), aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West

2012)), and two counts of mob action (720 ILCS 5/25-1(a)(1) (West 2012)). The case proceeded

to trial, and the jury found defendant guilty of all charges. The trial court sentenced defendant to

consecutive prison terms of 34 years for murder and 17 years for aggravated battery with a firearm.

Defendant appealed his convictions and sentences, and the appellate court affirmed. *People v.*

*Costic*, 2017 IL App (3d) 140218-U, ¶ 2. Thereafter, defendant filed a *pro se* postconviction petition, which the trial court summarily dismissed at the first stage. Defendant appealed that decision, and the Third District reversed and remanded for further postconviction proceedings. *People v. Costic*, 2021 IL App (3d) 180618, ¶ 2. The court appointed counsel to represent defendant, and counsel filed an amended postconviction petition. The State filed a motion to dismiss the amended petition, which the court granted. Defendant appeals, arguing that the court erred in dismissing his petition at the second stage because (1) he made a substantial showing of actual innocence, (2) he made a substantial showing of ineffective assistance of counsel, and (3) he received unreasonable assistance from postconviction counsel. For the reasons that follow, we affirm in part, reverse in part, and remand for third-stage postconviction proceedings on two of defendant's claims.

¶ 3                                 I. BACKGROUND

¶ 4        On April 30, 2013, defendant was charged by indictment with one count of first degree murder for shooting Treyshawn Blakely with a firearm and causing his death, one count of aggravated battery for discharging a firearm in the direction of Gerald Embrey and causing an injury, and two counts of mob action for disturbing the peace and causing injury to Blakely and Embrey.

¶ 5                                 A. Trial Proceedings

¶ 6        Defendant's jury trial was scheduled to begin on January 6, 2014. However, the courthouse was closed that day because of bad weather. Therefore, defendant's trial was postponed to January 7, 2014. On that day, defendant appeared in court with his counsel. Defense counsel stated that he spoke to defendant and "explained to him that because of the courthouse closing situation yesterday, our witnesses that are out of custody do not appear to be here today." Those

witnesses were Cynthia Singleton and Daniesha Crawley. Counsel stated:

> "In spite of that, we do have two defenses witnesses that *** arelast we know, were being held at the Peoria County Jail.
>
> After consulting with [defendant] this morning, it is his preference to proceed to trial with those two witnesses that are currently at the jail. If we are able to get the out-of-custody witnesses here, that's fine too. But with just the two that we have at the county jail, we are ready to proceed to trial."

When questioned by the trial court, defendant stated that he understood and still wished to proceed with trial, even if he "wouldn't have the benefit" of his witnesses at trial. Defendant further agreed that he understood the absence of his witnesses could affect his ability "to put on a defense." Finally, the court asked defendant, "Knowing that, do you still want to go forward with the trial, start with the trial today?" Defendant responded, "Yes."

¶ 7        The prosecutor then inquired about the identities of the in-custody witnesses. When the trial court informed the State that one of the witnesses was Michael Costic, defendant's brother, the State responded that he was charged with the same crimes as defendant, was represented by counsel, and may wish to invoke his "Fifth Amendment right against self-incrimination." See U.S. Const., amend. V. When the court asked defense counsel if he had talked to Michael's attorney, counsel responded that he had not spoken to Michael or his attorney but understood "that it is his right to invoke his Fifth Amendment right if he so chooses."

¶ 8        Following a break, the prosecutor notified the trial court that he had spoken to Michael's counsel, who indicated that Michael was going to decline to testify. The court then asked defendant if, after learning that his brother may not testify, he still wanted "to go forward with the trial today?" Defendant responded, "Yes." The following day, outside the presence of the jury,

Michael confirmed that he wanted to invoke his fifth amendment right and declined to answer any questions. As a result, the court ruled that defendant would not be allowed to call Michael as a witness.

¶ 9        The State's first witness was Officer David Logan of the Peoria Police Department. He testified that he responded to a call regarding a shooting at the intersection of Butler Street and Warren Street in Peoria on April 7, 2013. When he arrived, Logan observed a man lying in the street with what appeared to be a gunshot wound to his head. Logan also observed a man, who identified himself as Allen Fitzpatrick, sitting on a curb with blood around his face.

¶ 10        Logan testified that when he arrived on the scene, it was "pretty chaotic." He said there were between 50 and 75 people "running around the area." Logan was initially unable to obtain control of the scene "due to the number of people that were on scene, coming to the scene, rushing up, ignoring what officers were telling them to do." However, as more officers arrived, Logan secured the scene. Logan testified that he observed numerous spent cartridge cases on Butler Street but did not observe any weapons. Logan tried to talk to witnesses but said "very few people were cooperative or had any information."

¶ 11        The State's next witness, Gerald Embrey, testified that on April 7, 2013, he was walking on Butler Street with one of his friends. When he was one or two blocks away from the intersection of Butler and Warren Streets, he noticed "a big crowd just going everywhere." Embrey ran toward the intersection because there was a fight and he wanted to see what was happening. Once he was closer, Embrey saw Fitzpatrick unconscious and observed fights among other people. Embrey saw his friend, Treyshawn Blakely, running toward the intersection from Warren Street. About a minute after Embrey arrived at the intersection, he heard many rapid-fire gunshots and saw Blakely get shot in the back of his head. Embrey was shot in the leg but did not know who

shot him. Embrey testified that he saw Michael and defendant that day "[g]oing toward the fight [he assumed]," like he was. He did not see them carrying anything. He denied seeing either Michael or defendant fighting.

¶ 12     The State's next witness, Christeia Bonner, testified that on April 7, 2013, she was driving around with her friend, Kimberly Brock, in Brock's car. As she drove on Butler Street toward its intersection with Warren Street, a car in front of her was blocking the roadway. Before she turned onto Butler Street, she saw two Black men running toward Warren Street. She said the shorter of the two men had dreadlocks and the "taller, dark-skinned one" either had braids or "something on his hair." Bonner testified that she noticed those two men because they ran in front of her car and she "almost hit" them.

¶ 13     Bonner said there were more than 50 people near the intersection of Butler and Warren Streets. Bonner exited her vehicle to see what was going on. Shortly thereafter, Bonner heard a gunshot and saw people running. When Bonner looked in the direction of the gunshot, she saw the two men who ran past the car "moving back and forth, like maybe one was grabbing on the other." She then heard gunshot after gunshot, "like pop, pop, pop, pop, pop." Bonner got back into Brock's car, put it in reverse, and got out of the area. Bonner testified that she did not see either of the two men fire any shots, nor did she see either with a weapon.

¶ 14     Kimberly Brock testified that she was in the passenger seat of her car while Bonner was driving on April 7, 2013. She testified that when her vehicle was about halfway down Butler Street, she saw "a whole bunch of people in the middle of the street so we couldn't move." She saw people arguing in the intersection of Butler and Warren Streets. While her vehicle was stopped, she saw two men come from behind her, with one running in front of the other. Brock said "a lot" of gunshots came from the man in front, who "had longer hair than the other one."

Brock said the man shot into the crowd of 20 to 30 people.

¶ 15	The next day, Brock went to the police station, where she identified defendant as the shooter from a 12-person photo lineup. She identified Michael from a six-person photo lineup as the individual running behind the shooter. Brock also identified defendant in court as the shooter.

¶ 16	Officer John Williams of the Peoria Police Department testified that he responded to the scene on Butler Street on April 7, 2013, and "immediately observed a lifeless body in the middle of the street." When Williams arrived, a lot of people were in the area. When the crowd dispersed, Williams searched the scene and found 21 fired .223 cartridge cases.

¶ 17	The next day, Williams and other officers executed a search warrant at 1614 Butler Street, where defendant and Michael resided. Police located a safe in an upstairs bedroom, which contained several guns, two .223 live cartridges, and an empty 50-round box of .223 Remington ammunition. Those were the same types of bullets found at the crime scene. The gun used in the shooting was not found.

¶ 18	Jared Hanneman testified that he and defendant were cellmates in the Peoria County jail for about two months. At the time of defendant's trial, Hanneman was in jail on several charges that were working through the "drug court system." Hanneman testified that defendant told him that on the night Blakely was killed, he and some friends left a party and ran "into a group of people that they had some animosity with, and they had gotten into a fight with them." Defendant said his brother Michael was with him and that he and Michael "both were a part of that fight." Defendant said Michael "grabbed a gun and started taking shots into the group of people." After that, defendant and Michael "left the scene and went to go basically go hide out." Defendant told Hanneman that Michael shot and killed Blakely. Hanneman denied receiving any promises in

exchange for his testimony against defendant.

¶ 19 On cross-examination, Hanneman admitted that defendant talked about what happened on April 7, 2013, throughout the two months he and defendant were cellmates, but Hanneman did not inform police about defendant's statements until just a few days before defendant's trial. Hanneman agreed that he had two separate cases pending against him, one in felony court and one in drug court. The charges in the drug court case were business burglary and possession of a controlled substance, and the charges in the felony case were aggravated battery of a police officer and resisting arrest. Hanneman said both cases were "pending with no disposition." Hanneman testified that the agency that charged him in those cases was the Peoria County State's Attorney's Office, the same agency prosecuting defendant's case. When defense counsel asked Hanneman what he expected to receive from testifying against defendant, Hanneman responded that he "d[id] not expect to receive *** anything from this." Hanneman said he had previously been on probation for "other controlled substance charges." He agreed that he had been charged with possessing drugs in at least two separate cases. Defense counsel then asked: "You a drug addict, Mr. Hanneman?" Hanneman responded: "That is not correct. I just recreationally use drugs."

¶ 20 Dr. John Scott Denton performed Blakely's autopsy and testified that his cause of death was a gunshot wound to the back of the head fired by a high-velocity rifle from two or more feet away. Forensic scientist Dustin Johnson examined the 21 cartridge cases that were recovered from the scene. He opined that all 21 cartridges were fired from the same gun, which was never located.

¶ 21 Defendant's only witness, Twila Williams, testified that she was at her mother's house on the 1600 block of Butler Street on April 7, 2013. When she went outside, she saw 40 or

50 people in the street and Fitzpatrick bleeding and staggering. Williams denied witnessing any fighting but said she saw the shooter. Williams identified the shooter as Michael. Williams said "another guy" was with Michael, but she "didn't quite get a good look at him." Williams testified that she did not remember seeing defendant "at all" that day.

¶ 22　　　　In closing arguments, the prosecutor argued that defendant was responsible for Michael's actions under an accountability theory. Defense counsel argued that because Hanneman had charges pending with "the same agency prosecuting this case," he had "nothing to lose by providing false testimony in this case" and "everything to gain." Defense counsel also noted that "while Jared Hanneman did not admit to being a drug addict, he did admit to being a drug user."

¶ 23　　　　The jury found defendant guilty of all charges. In response to a special interrogatory, the jury found that the allegation that defendant was armed with a firearm during the commission of first degree murder was "not proven." Defendant filed a motion for a new trial, which the trial court denied.

¶ 24　　　　The trial court sentenced defendant to consecutive prison terms of 34 years for murder and 17 years for aggravated battery with a firearm. Defendant filed a motion to reconsider his sentence, which the court denied.

¶ 25　　　　　　　　　　B. Posttrial Proceedings

¶ 26　　　　　　　　　　1. *Defendant's Direct Appeal*

¶ 27　　　　Defendant appealed his convictions and sentence. The Third District affirmed, holding that (1) the evidence was sufficient to prove defendant guilty of felony murder based on the predicate felony of mob action; (2) the evidence was sufficient to prove defendant guilty of aggravated battery with a firearm based on accountability; (3) defendant forfeited review of the prosecutor's statements during closing arguments and the evidence was not so closely balanced to

warrant plain-error review; (4) defendant waived the issue of previously subpoenaed defense witnesses failing to testify at trial and failed to make a clear claim of ineffective assistance of counsel regarding that issue; and (5) the trial court did not abuse its discretion in sentencing defendant. (C 245-269). *Costic*, 2017 IL App (3d) 140218-U, ¶¶ 41-72.

¶ 28                                       2. *Defendant's Pro Se Postconviction Petition*

¶ 29            In May 2018, defendant filed a *pro se* postconviction petition, raising more than 20 claims, including actual innocence and ineffective assistance of counsel. Defendant attached many exhibits to his petition, including (1) official court documents related to Hanneman's criminal cases, (2) police reports from Hanneman's arrests, (3) an affidavit from Michael, (4) an affidavit from Fitzpatrick, (5) trial testimony provided by Cynthia Singleton at Michael's trial, and (6) a police report containing statements from Shawn and Tyrell Joiner (while Tyrell's name is spelled differently in the police report, this is how defendant spelled it) about the incident on April 7, 2013.

¶ 30            According to court documents attached to the petition, Hanneman pled guilty to burglary in Peoria County case No. 13-CF-00144-1 and possession of a controlled substance in Peoria County case No. 13-CF-11069-1 on June 13, 2013. He was sentenced for those crimes on February 5, 2014. In police reports drafted by Bartonville police officers on February 13, 2013, an officer reported that Hanneman "admitted that he has a drug problem and said he wants to get help with it." Hanneman also told an officer that "he is addicted to a drug called 'molly' which he said was pure Ecstasy in powder form, which he mixes with powder cocaine." Hanneman also reportedly told an officer that "he needs help with his drug addiction."

¶ 31            In his affidavit, Michael stated that he left his grandmother's home at 1614 Butler Street "alone" on April 7, 2013, because he saw a group of people on the 1500 block of Butler Street and wanted "to buy some marijuana." Michael said that when he reached the intersection,

he was approached by a group who thought he was "somebody else." The group continued to pursue Michael and attacked him. Michael stated:

> "I somehow managed to breakaway from them and run to my grandma[']s house, where I retrieved a gun, ran back to where the group had jumped me and was still standing. Since the house and where the people attacked me were so close it only took me a few seconds to run home grab the gun and run back to the corner. I never stopped to talk to anybody. I never told anyone what I was going to do and I never asked for help from anyone. When I made it to the house I was alone. I grabbed the gun by myself and I went back to the scene where I fired the gun alone standing by myself. When the shooting was over I ran away alone. I never conspired with anyone about what I was going to do. *** I never stopped to talk to anyone. *** Since I didn[']t talk to anyone or even run into anyone I made a choice based off of impulse and on my own."

¶ 32        In his affidavit, Fitzpatrick stated that he pulled up to the corner of Butler and Warren Streets on April 7, 2013, when he observed his "associate" Darryl "getting pushed" by someone. Fitzpatrick stated he then turned the corner onto Butler Street and exited his vehicle to "assist Darryl." Fitzpatrick heard someone say, " 'That's ALLEN we're going to jump him.' " Fitzpatrick then began swinging and struck someone twice before he was hit from behind by someone else. Fitzpatrick said he "was conscious throughout the whole fight and never witnessed [defendant] among the crowd of onlookers nor was he a part of the group attacking me." Fitzpatrick stated he knew defendant "from being around [him] in the neighborhood which would have made seeing him easy because of his physical appearance." Fitzpatrick further stated: "I was conscious when the shooting started but never witnessed who was doing the shooting or from what direction

the shots came from."

¶ 33     At Michael's trial, where he was charged for the same crimes as defendant, Singleton testified that on April 7, 2013, she was on the front porch of her residence at 1602 West Butler Street. She said a lot of people were outside. She said the next thing she knew, she saw "a bunch of people fighting." Shortly thereafter, she "heard gunshots." She said she observed someone walking down the street shooting "a big gun." She testified that the shooter was Michael and identified him in court. Singleton said she saw Michael "defending himself" in the fight but did not remember anyone else in the fight. Singleton testified that when "a bunch of dudes jumped" Michael, someone else was with him, but she could not remember who. She said Michael was walking away from his house when he was shooting.

¶ 34     When asked if she saw defendant at all on April 7, 2013, Singleton responded: "I don't remember" "seeing the man, but they said I said he was there, but I don't remember it." Singleton testified that she did not recall defendant being in the fight. Singleton said she did not remember telling the police that she saw defendant, "but they said I told them that."

¶ 35     According to a police report dated April 9, 2013, Shawn and Tyrell Joiner told officers they were on Warren and Butler Streets on April 7, 2013, and saw some people fighting. Shawn said that Michael was involved in the fight. As Shawn was watching the fight, he heard gunshots. He said he immediately started running away and did not see who was shooting. Tyrell told officers he was involved in the fighting when he heard three gunshots and immediately took off running. He said he then heard more gunshots, "like someone was unloading the gun."

¶ 36     In July 2018, the trial court entered an order dismissing defendant's postconviction petition at the first stage of postconviction proceedings, finding that "each and every one of Defendant's claims are frivolous and patently without merit." Defendant filed a petition for

rehearing, which the court denied.

¶ 37    Defendant appealed the dismissal of his *pro se* petition. In 2021, the Third District reversed the trial court's decision and remanded the matter for further postconviction proceedings. *Costic*, 2021 IL App (3d) 180618, ¶ 2. The court ruled that defendant's "petition and supporting affidavit from his brother Michael adequately alleged a claim of actual innocence, entitling him to appointment of counsel at the second stage." *Costic*, 2021 IL App (3d) 180618, ¶ 28. The court noted that defendant raised several additional claims that it did not address because it remanded defendant's entire postconviction petition for further proceedings. *Costic*, 2021 IL App (3d) 180618, ¶ 28.

¶ 38            3. *Defendant's Amended Postconviction Petition*

¶ 39    On remand, defendant was appointed counsel to represent him in further postconviction proceedings. In July 2022, defendant's counsel filed an amended postconviction petition, which incorporated all the arguments from defendant's original *pro se* postconviction petition and an amended *pro se* postconviction petition, which was attached thereto. The amended postconviction petition alleged, in part, that (1) defendant's trial counsel was ineffective for failing to investigate Hanneman's criminal history and properly impeach him at trial; (2) defendant's trial counsel was ineffective for failing to subpoena necessary witnesses, including alibi witness Olexis Evans and eyewitnesses Cynthia Singleton, Daniesha Crawley, and Allen Fitzpatrick; (3) defendant's trial counsel was ineffective for failing to interview critical witnesses, including Evans, Fitzpatrick, Daryl McGhee Jr., Tyrell Joiner, and Shawn Joiner; (4) defendant was actually innocent of the charges for which he was convicted; and (5) defendant's appellate counsel was ineffective for failing to raise various arguments on appeal. According to the amended petition, defendant's trial counsel's actions fell below "an objectively reasonable standard" and that "[b]ut

- 12 -

for that failure, the outcome of the case would have been different."

¶ 40 Attached to the petition was an affidavit from Evans, as well as a police report containing Crawley's statements to police. Counsel also filed a certificate of compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017).

¶ 41 According to Evans's affidavit, defendant's grandmother, Donna McNeil, lived at 1614 Butler Street in Peoria. On April 7, 2013, Evans and defendant were sitting on the porch of McNeil's home. Evans said, "There were alot [*sic*] of People Outside up and Down Butler Street." Within about 10 minutes of arriving at McNeil's home, Evans noticed a fight on the corner of Butler and Warren Streets. Evans stated that she noticed that Michael, "was being Jumped on, being Hit and Punched by a Bunch of People." Evans then stated:

> "Michael Costic was able to get away from Those People and Then Came
>
> to Ms. McNeil's Home, where [defendant] Checked to See if Michael was okay as
>
> [defendant] and Michael stood out in the From [*sic*] Yard.
>
> At That Point, [defendant] and I Got into my Car and left ***.
>
> *** [Defendant] and I had Been in my Car together Driving Towards
>
> Western Avenue when [defendant] and I Heard Gun Shots in The Distance."

According to Evans, police searched her home on April 8, 2013, and "Found Nothing." After that, police took Evans to the police station and questioned her about her whereabouts on April 7, 2013. Evans told police that she and defendant were together at defendant's grandmother's house, left in her car, "and while Driving away We Heard Shots." Evans further stated that she "Repeatedly called" defendant's trial counsel and expressed her wishes to testify on defendant's behalf at trial. Despite her phone calls, Evans stated that defendant's trial counsel never interviewed her or called her to testify.

¶ 42        In the police report containing Crawley's statements to police, Crawley stated that she was sitting on her porch on April 7, 2013, and that someone was having a barbecue in the 1500 block of Butler Street. Crawley stated "that there were a lot of people out and they all walked to the intersection of Butler and Warren." Crawley reported seeing Michael and many others involved in a fight at the intersection of Butler and Warren Streets. Crawley said she "grew up" with both Michael and defendant and knew "them both well." Crawley went inside her house to get towels, and when she went back outside, she saw defendant and Michael walking together on Butler Street "coming from 1614 W Butler." Crawley said that was the first time she saw defendant that day. Crawley then went inside to call the police, and when she came back outside, she "saw Michael Costic with a big rifle shooting from the hip into the crowd." Crawley said she "laid on the floor and did not get up again until the shooting stopped." When she got up, she did not see Michael or defendant.

¶ 43        The State filed a motion to dismiss defendant's amended postconviction petition. The trial court held a hearing on the motion. Thereafter, the court entered an order granting the motion and dismissing the petition. The court found that defendant's claim of actual innocence was "affirmatively rebutted by the record." The court ruled that the remainder of defendant's claims were forfeited because they "appear on the record and could have been raised on appeal."

¶ 44        This appeal followed.

¶ 45                        II. ANALYSIS

¶ 46                        A. The Post-Conviction Hearing Act

¶ 47        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)) "provides a means for individuals serving criminal sentences to assert that their convictions resulted from substantial denials of their constitutional rights." *People v. Hilliard*, 2023 IL 128186,

¶ 18. There are three stages of postconviction proceedings. *Hilliard*, 2023 IL 128186, ¶ 19. At the first stage, the court reviews the petition independently to determine whether it is " 'frivolous or is patently without merit.' " *Hilliard*, 2023 IL 128186, ¶ 19 (quoting 725 ILCS 5/122-2.1(a)(2) (West 2018)). If the court does not summarily dismiss the petition pursuant to this standard, the matter proceeds to the second stage. *Hilliard*, 2023 IL 128186, ¶ 19. At that point, the court may appoint counsel for the defendant, and the State may answer the petition or move to dismiss it. *People v. Domagala*, 2013 IL 113688, ¶ 33. If the defendant's petition and any accompanying documentation make a substantial showing of a constitutional violation, the matter proceeds to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶¶ 33-34. At that evidentiary hearing, the trial court "serves as the fact finder" by assessing witness credibility, weighing testimony, resolving evidentiary conflicts, and ultimately determining whether the defendant is entitled to postconviction relief. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 48        The present appeal involves the second stage of postconviction proceedings. The sole focus at this point is "the legal sufficiency of the petition." *Domagala*, 2013 IL 113688, ¶ 35. Accordingly, in evaluating whether a defendant made a substantial showing of a constitutional violation at the second stage, the court may not make factual findings or determine credibility. *Domagala*, 2013 IL 113688, ¶ 35. Rather, the court must accept as true all well-pleaded facts in the petition and supporting documents that are not "affirmatively refuted by the record." *Domagala*, 2013 IL 113688, ¶ 35.

¶ 49        At the second stage, the question is whether the defendant's well-pleaded allegations, if proven at an evidentiary hearing, would justify granting postconviction relief. *Domagala*, 2013 IL 113688, ¶ 35. We review *de novo* an order dismissing a petition at the second stage. *People v. Huff*, 2024 IL 128492, ¶ 13.

¶ 50                                    B. Actual Innocence

¶ 51        "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *People v. Robinson*, 2020 IL 123849, ¶ 47. To be "newly discovered," evidence must have been discovered after trial and must not have been capable of being discovered earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is material "if it is relevant and probative of the petitioner's innocence." *Robinson*, 2020 IL 123849, ¶ 47. Noncumulative evidence is information that adds to what the factfinder heard at trial. *Robinson*, 2020 IL 123849, ¶ 47. Finally, evidence is of a "conclusive character" if when considering it with all the trial evidence, it "would probably lead to a different result." *Robinson*, 2020 IL 123849, ¶ 47. "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 52        The ultimate question is whether the new evidence "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48. New evidence does not need to be entirely dispositive to be likely to alter the result on retrial. *Robinson*, 2020 IL 123849, ¶ 48. "It need only be *conclusive* enough to *probably* change the result upon retrial." (Emphases in original.) *People v. Davis*, 2012 IL App (4th) 110305, ¶ 62. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Robinson*, 2020 IL 123849, ¶ 48. An affidavit that provides evidence that someone other than the defendant committed the offense "is of such a conclusive character as to lead to a different result on retrial." *Robinson*, 2020 IL 123849, ¶ 76.

¶ 53        Where new evidence is positively rebutted by the evidence presented at trial, it is

not conclusive. See *People v. Sanders*, 2016 IL 118123, ¶ 52. Evidence in supporting affidavits is not positively rebutted by the record simply because it is contradicted by evidence presented at trial. *Robinson*, 2020 IL 123849, ¶ 60; *People v. McCoy*, 2023 IL App (1st) 220148, ¶ 12. "For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. Some degree of conflict is to be expected when a defendant raises a claim of actual innocence in a postconviction petition. *McCoy*, 2023 IL App (1st) 220148, ¶ 11; see *Robinson*, 2020 IL 123849, ¶ 57 (explaining that if new evidence of innocence does not contradict the evidence of the petitioner's guilt at the trial, the filing of a postconviction petition would be pointless and the purpose of the Act rendered meaningless).

¶ 54        When determining if new evidence is rebutted by the record, the reviewing court must consider the type of evidence presented at trial. "For example, in *Sanders*, a codefendant's recantation was positively rebutted by the trial record and was, therefore, not conclusive, when the recanting codefendant claimed that the victim had only been shot once, but the medical examiner had testified at trial that the victim had in fact been shot twice." *McCoy*, 2023 IL App (1st) 220148, ¶ 10 (citing *Sanders*, 2016 IL 118123, ¶ 48). However, eyewitness identification testimony is "not of the same conclusive character as a medical examiner's testimony regarding the number of times that a victim had been shot." *McCoy*, 2023 IL App (1st) 220148, ¶ 12. The mere fact that witnesses identified the defendant as the shooter does not positively rebut allegations that someone else committed the crime at the second stage of postconviction proceedings. *McCoy*, 2023 IL App (1st) 220148, ¶ 12. Where a codefendant admits to committing a crime and avers that the defendant was not involved, it is hard to believe that the jury would still convict the defendant based solely on

contrary eyewitness trial testimony. *McCoy*, 2023 IL App (1st) 220148, ¶ 14.

¶ 55　　　　The amount of evidence of the defendant's guilt presented at trial is also relevant to determining whether new evidence is conclusive. Where limited evidence of the defendant's guilt is presented at trial, an exoneration from a codefendant will probably change the result if the jury were to hear and believe the codefendant's testimony. *McCoy*, 2023 IL App (1st) 220148, ¶ 14; see *Robinson*, 2020 IL 123849, ¶¶ 82-83 (finding that where no physical or forensic evidence linked the defendant to crimes and the only trial evidence of the defendant's guilt consisted of his own inculpatory statement, as well as testimony from State witnesses to whom the defendant allegedly confessed, a confession from someone else constituted evidence of such a conclusive character that it would probably lead to a different result).

¶ 56　　　　In this case, the State does not dispute that the allegations contained in Michael's affidavit and defendant's amended postconviction petition meet the first two requirements of an actual innocence claim because they are newly discovered, material, and noncumulative. Thus, the only issue we must consider is if the allegations and Michael's affidavit are conclusive. The trial court dismissed defendant's claim of actual innocence on the basis that it was "affirmatively rebutted" by the evidence presented at trial. We disagree.

¶ 57　　　　Defendant's actual innocence claim is premised on Michael's affidavit. Michael was charged with the same crimes as defendant and did not testify at defendant's trial because he invoked his fifth amendment right. In his affidavit, Michael averred that he was "alone" when he went to the intersection of Warren and Butler Streets and was attacked by a group of men there, after which he returned to his grandmother's house "alone" to retrieve a gun, returned to the intersection "alone" with a gun, shot into the crowd "alone," and fled from the scene "alone."

¶ 58　　　　At defendant's trial, two eyewitnesses, Brock and Embrey, testified that defendant

was present at or near the intersection of Butler and Warren Streets on April 7, 2013. Additionally, defendant's former cellmate, Hanneman, testified that defendant told him he was present and fighting at the intersection on the day of Blakely's death. That the testimony of those witnesses conflicts with facts contained in Michael's affidavit does not render Michael's affidavit positively rebutted, as some degree of conflict is to be expected when a defendant alleges actual innocence. See *McCoy*, 2023 IL App (1st) 220148, ¶ 12. Furthermore, that the conflicting evidence came from lay witnesses, including two eyewitnesses and a jailhouse informant, supports the conclusion that Michael's affidavit was not positively rebutted. Unlike scientific evidence, which is generally conclusive, the testimony of eyewitnesses is generally not conclusive because eyewitnesses can be mistaken. See *McCoy*, 2023 IL App (1st) 220148, ¶ 12; see also *People v. Johnson*, 2024 IL App (1st) 220494, ¶ 102 ("We know eyewitness testimony to be unreliable."). Additionally, "the testimony of jailhouse informants must be viewed with caution." *People v. Belknap*, 2014 IL 117094, ¶ 55. Where, as here, no physical or scientific evidence linked defendant to the crime scene or the shooting, the record does not positively rebut Michael's allegations that he was "alone." See *McCoy*, 2023 IL App (1st) 220148, ¶ 12.

¶ 59　　　　Additionally, Michael's proffered testimony, if believed by the factfinder, is of such conclusive character that it would probably produce a different result on retrial. Given the nature of the State's evidence of defendant's guilt presented at trial, consisting of conflicting eyewitness testimony and testimony from a jailhouse informant, Michael's affidavit would probably change the result if the jury were to hear and believe his testimony. See *McCoy*, 2023 IL App (1st) 220148, ¶ 12. At the very least, for the purposes of pleading a postconviction claim, Michael's allegations place the trial evidence in a different light and undermine confidence in the verdict. See *Robinson*, 2020 IL 123849, ¶ 48. Accordingly, defendant has made a substantial showing of actual innocence

sufficient to advance this claim to a third-stage evidentiary hearing.

¶ 60                         C. Ineffective Assistance of Trial Counsel

¶ 61          Defendant alleges that his trial counsel was ineffective in three ways: (1) failing to interview and call certain witnesses to testify at trial, (2) proceeding to trial without defendant's subpoenaed witnesses, and (3) failing to impeach Hanneman.

¶ 62          Claims of ineffective assistance of counsel are judged under the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Dupree*, 2018 IL 122307, ¶ 44. Under this standard, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *People v. Enis*, 194 Ill. 2d 361, 376-77 (2000). Failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Enis*, 194 Ill. 2d at 377.

¶ 63          Below, the trial court ruled that defendant forfeited his claims of ineffective assistance of counsel because he did not raise them on direct appeal. It is true that all issues decided on direct appeal are *res judicata*, and all issues that could have been raised on appeal but were not are forfeited. *People v. Morris*, 335 Ill. App. 3d 70, 75-76 (2002). However, where a claim of ineffective assistance of counsel is based on matters outside the record, it could not have been raised on appeal and consequently is not forfeited. *Morris*, 335 Ill. App. 3d at 76. Here, the ineffective-assistance claims raised by defendant were based on matters outside the record, such as what potential witnesses would have testified to at trial, communications between counsel and

potential witnesses, and conversations between counsel and defendant. Thus, defendant did not forfeit these claims. See *Morris*, 335 Ill. App. 3d at 76; *People v. Makiel*, 358 Ill. App. 3d 102, 105 (2005).

¶ 64                                    1. *Failure to Investigate and Call Witnesses*

¶ 65           "Although the decision of whether to present a witness is generally considered a matter of trial strategy, 'counsel may be deemed ineffective for failure to present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense.' " *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 39 (quoting *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999)). "Moreover, strategic decisions may be made only after there has been a thorough investigation of law and facts relevant to plausible options." (Internal quotation marks omitted.) *Upshaw*, 2017 IL App (1st) 151405, ¶ 39. "The failure to interview witnesses may indicate incompetence, particularly when the witnesses are known to trial counsel and their testimony may be exonerating." *People v. Steidl*, 177 Ill. 2d 239, 256 (1997).

¶ 66           "Attorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *Morris*, 335 Ill. App. 3d at 79. Thus, failure to conduct an investigation, develop a defense, and present available witnesses to corroborate a defense can amount to ineffective assistance. *Morris*, 335 Ill. App. 3d at 79; *Makiel*, 358 Ill. App. 3d at 108-09. Specifically, "[f]ailure to subpoena witnesses known to defense counsel who contradict the State's case or provide exonerating testimony demonstrates ineffective assistance of counsel." *Makiel*, 358 Ill. App. 3d at 106. On the other hand, counsel's failure to call a witness whose testimony would not have exonerated the defendant does not support a claim of ineffective assistance. See *People v. Campbell*, 332 Ill. App. 3d 721, 731-32 (2002).

¶ 67    Whether counsel's failure to investigate and call witnesses prejudiced the defendant is determined by the value of the evidence that was not presented at trial and the closeness of the evidence that was presented. *Makiel*, 358 Ill. App. 3d at 107. Where no physical evidence linked the defendant to the crime and the jury's decision rested on its judgment of the credibility of the witnesses, affidavits that tend to discredit the testimony of trial witnesses, such as those from alibi witnesses, can establish a claim of ineffective assistance that should proceed to a third-stage evidentiary hearing. See *Steidl*, 177 Ill. 2d at 256-57; *Upshaw*, 2017 IL App (1st) 151405, ¶¶ 46, 51; *Morris*, 335 Ill. App. 3d at 85-86; *Tate*, 305 Ill. App. 3d at 612. A third-stage hearing is often necessary to determine if counsel made a "professionally reasonable tactical decision" not to call alibi witnesses or was simply incompetent. *Tate*, 305 Ill. App. 3d at 612; see *People v. Gibson*, 244 Ill. App. 3d 700, 704 (1993) (finding that defense counsel's decision not to call an alibi witness could have been a matter of strategy or could "have been pure incompetence"). "Once evidence is heard on the subject, the circuit court will be in a better position to determine whether a *Strickland* deprivation of counsel occurred." *Gibson*, 244 Ill. App. 3d at 704.

¶ 68    When a defendant alleges in his postconviction petition that his counsel was ineffective for failing to call certain witnesses at trial, the defendant must attach affidavits, records, or other evidence from the witnesses establishing what their testimony would have been or provide a sufficient explanation as to why such documents are not attached. See *People v. Harris*, 2019 IL App (4th) 170261, ¶¶ 12-15. An affidavit from the defendant asserting what he believes the witnesses will testify to is insufficient because it "does not demonstrate defendant's allegation in his petition is capable of objective or independent corroboration, nor does it identify the availability of evidence alleged to support the petition's allegation." *Harris*, 2019 IL App (4th) 170261, ¶ 14. Furthermore, "imprisonment, by itself, cannot excuse a defendant's failure to attach

supporting material to a postconviction petition." *Harris*, 2019 IL App 170261, ¶ 19. Where a defendant fails to attach to his postconviction petition supporting material or provide a reasonable explanation for its absence, dismissal of defendant's ineffective-assistance claims is appropriate. *Harris*, 2019 IL App 170261, ¶ 20.

¶ 69                                             a. Evans

¶ 70        Defendant alleged in his postconviction petition that his counsel was ineffective for failing to "investigate, interview, and subpeona [*sic*] eye witness/alibi witness, Olexis L. Evans." He further alleged that his counsel knew Evans's address, phone number, and place of employment at the time of trial. Defendant alleged that he was prejudiced by counsel's failure "to investigate, interview, and subpeona [*sic*] this readily available witness that was exculpatory in nature and who established an alibi for [defendant]."

¶ 71        In her affidavit, Evans averred that she was with defendant on his grandmother's porch on April 7, 2013, witnessed fighting at the intersection of Butler and Warren Streets, and observed Michael being hit and punched. According to Evans, Michael was able to break free and return to his grandmother's home. Evans stated that after defendant made sure Michael was okay, he got into a car with her and left. She stated that defendant was driving away when they heard gunshots. Evans further stated that she "[r]epeatedly called" defendant's trial counsel and expressed her wishes to testify on defendant's behalf at his trial. Despite her phone calls, Evans stated that defendant's trial counsel never interviewed her or called her to testify.

¶ 72        Here, defendant's allegations that his trial attorney failed to interview or subpoena Evans as a witness are unrebutted by the record. The record as developed up to this point reflects no strategic reason for defense counsel's failure to contact, interview, subpoena, or call Evans as a defense witness to provide her alibi testimony. See *Makiel*, 358 Ill. App. 3d at 108. Thus, at this

second stage of postconviction proceedings, defendant has sufficiently alleged that his counsel's representation fell below an objective standard of reasonableness under the first prong of the *Strickland* test. See *Makiel*, 358 Ill. App. 3d at 108.

¶ 73    Defendant's allegations also satisfy the second prong of his ineffective-assistance claim. The facts contained in Evans's affidavit establish that defendant was not present during the fighting or shooting on April 7, 2013, and, therefore, did not commit mob action, felony murder, or aggravated battery with a firearm.

¶ 74    Having satisfied both *Strickland* prongs, defendant has demonstrated a substantial showing of a constitutional violation, requiring an evidentiary hearing. See *Upshaw*, 2017 IL App (1st) 151405, ¶¶ 46, 51; *Morris*, 335 Ill. App. 3d at 85-86; *Tate*, 305 Ill. App. 3d at 612. We reverse the trial court's dismissal of this claim of ineffective assistance of counsel.

¶ 75                                b. Fitzpatrick

¶ 76    Defendant also alleged that he was denied effective assistance because his counsel failed to interview and call Fitzpatrick as a witness at his trial. According to defendant's petition, "Fitzpatrick's testimony would have confirmed that [defendant] was not involved in any fighting nor was [defendant] on the corner of Butler and Warren any [time] that day." Defendant further alleged that his counsel knew Fitzpatrick's whereabouts because he was in the Peoria County jail with defendant. According to defendant, his counsel told him that it would be a " 'waste of time' " to interview Fitzpatrick because "he wasn't beneficial to the defense."

¶ 77    In his affidavit, Fitzpatrick averred that he was attacked at the intersection of Butler and Warren Streets on April 7, 2013, and "never witnessed [defendant] among the crowd of onlookers nor was he a part of the group attacking [him]." Fitzpatrick further stated that he "never witnessed who was doing the shooting or from what direction the shots came from."

¶ 78 Unlike the facts contained in Evans's affidavit, the facts contained in Fitzpatrick's affidavit would not have exonerated defendant. That Fitzpatrick did not see defendant among the large group of people at the intersection while Fitzpatrick was being attacked does not necessarily mean that defendant was not present at the intersection or involved in the fighting that took place there. Additionally, Fitzpatrick admitted that he did not see the shooter or where the shots came from. Therefore, Fitzpatrick's testimony does not establish that defendant was not with Michael at the time of the shooting. Because Fitzpatrick's testimony would not have exonerated defendant of the crimes of which he was convicted, defense counsel was not ineffective for failing to interview and subpoena Fitzpatrick to testify. See *Campbell*, 332 Ill. App. 3d at 731-32. Therefore, we affirm the trial court's dismissal of this claim.

¶ 79 c. McGhee

¶ 80 Defendant also alleged that his trial counsel was ineffective for failing to interview "eye witness and victim Daryl Mc[G]hee Jr." According to defendant, McGhee spoke to him when they were "on the same bus" to be transported from jail to their respective court hearings. According to defendant, McGhee told him that he never saw defendant "fighting on the corner any time that day" and believed that defendant had been mistaken for someone else. Defendant further alleged: "Now that I am incarcerated and am indigent with no way of contacting Mc[G]hee or know of his current whereabouts, I am unable to obtain an affidavit from this eyewitness/victim."

¶ 81 Defendant's failure to provide an affidavit or any other supporting document establishing what McGhee's testimony would have been at trial are fatal to this claim. Defendant's allegations about what McGhee told him are insufficient because they have not been objectively or independently corroborated. See *Harris*, 2019 IL App (4th) 170261, ¶ 14. Additionally, defendant's excuse for not providing an affidavit or other supporting documents from McGhee is

insufficient because "imprisonment, by itself, cannot excuse a defendant's failure to attach supporting material to a postconviction petition." *Harris*, 2019 IL App 170261, ¶ 19. Because defendant failed to attach materials supporting his allegations or provide a reasonable explanation for their absence, the trial court properly dismissed this claim of ineffective assistance of counsel. See *Harris*, 2019 IL App 170261, ¶ 20. We affirm the trial court's dismissal of this claim.

¶ 82                                    d. Shawn and Tyrell Joiner

¶ 83            Defendant further alleged that his counsel was ineffective for failing to "investigate[,] interview, or subpeona [*sic*] Tyrell 'Freddie' Joiner and Shawn Joiner who was [*sic*] charged, convicted, and sentenced to Mob Action, a charge that stemmed from the incident in which [defendant] was tried and convicted for." Defendant alleged that Shawn and Tyrell were "supreme eyewitnesses to the incident" and that they "would have testified that [defendant] was not apart [*sic*] of the melee that occurred on the corner of Butler and Warren [on] April 7, 2013, and also that [defendant] was not amongst the crowd of bystanders." Defendant asserted: "Now I have currently no way of contacting or knowing either of there [*sic*] whereabouts to obtain affidavits from either individual to include in this petition."

¶ 84            In support of his contentions, defendant attached a copy of a police report from two days after the incident. At that time, Shawn told officers that he and his brother were on Warren and Butler Streets on April 7, 2013, and saw some people involved in a fight. Shawn said that as he was watching the fight, he heard gunshots. He said he immediately started running and did not see who was shooting. Tyrell told officers he was involved in the fight when he heard three gunshots and immediately took off running. Neither Shawn nor Tyrell mentioned defendant in their statements to police.

¶ 85            Because Shawn's and Tyrell's statements to police contain no mention of

defendant, defendant had to attach to his postconviction petition an affidavit or other document establishing what Shawn and Tyrell would have testified to at trial. See *Harris*, 2019 IL App (4th) 170261, ¶¶ 12-14. Defendant failed to do so. Thus, defendant has not provided any objective or independent corroboration of the allegations in his petition. See *Harris*, 2019 IL App (4th) 170261, ¶ 14. Additionally, defendant failed to provide an adequate reason for failing to provide affidavits or other supporting documents to his petition. See *Harris*, 2019 IL App (4th) 170261, ¶ 19. In the absence of affidavits or other materials supporting defendant's allegations or any reasonable explanation for their absence, the trial court properly dismissed this claim of ineffective assistance of counsel. See *Harris*, 2019 IL App (4th) 170261, ¶ 20. We affirm that dismissal.

¶ 86          2. *Proceeding to Trial Without Subpoenaed Witnesses*

¶ 87          Defendant alleged that his counsel was ineffective for recommending that he proceed to trial without his subpoenaed witnesses, Singleton and Crawley, instead of seeking a continuance due to their absence. In his *pro se* postconviction petition, defendant alleged: "Counsel's performance was prejudicial towards [defendant] in that a continuance requested in order to reissue the subpeonas [*sic*] would have dramatically changed the course of the proceedings." In his amended petition, defendant alleged that counsel's failure to secure the presence of Singleton and Crawley at his trial "fell below an objectively reasonably standard," and but for that failure, the outcome of the proceedings and case "would have been different."

¶ 88          Defense counsel's failure to seek a continuance to secure the presence of a material witness can be an objectively unreasonable error that supports a claim of ineffective assistance. See *People v. Clamuextle*, 255 Ill. App. 3d 504, 510 (1994). However, where the witness's testimony would not have exonerated the defendant and there was sufficient evidence to support the jury's finding of guilt, a claim of ineffective assistance fails because any alleged deficiency in

not seeking a continuance would not have affected the outcome of the trial. See *People v. Steading*, 308 Ill. App. 3d 934, 938-40 (1999).

¶ 89    A review of defendant's petition and the supporting documents reveals that the trial court properly dismissed this claim of ineffective assistance of counsel. First, with respect to Singleton, her testimony at Michael's trial was that she did not remember seeing defendant at the intersection of Butler and Warren Streets on April 7, 2013, but that the police told her she reported seeing defendant there. She also reported seeing someone next to Michael but did not know who it was. This testimony is far from exonerating and might even be deemed harmful to defendant. Thus, defense counsel's failure to request a continuance to obtain Singleton's presence at trial would not have affected the outcome of the proceedings and did not amount to ineffective assistance. See *Steading*, 308 Ill. App. 3d at 938-40.

¶ 90    The same is true for Crawley. In Crawley's statement to police, she reported seeing Michael involved in the fighting at the intersection of Warren and Butler Streets, saw defendant and Michael walking together toward the intersection after that, and later saw Michael shooting a rifle into the crowd. This testimony is also not exonerating because it supports the trial testimony that defendant was with Michael when he fired the shots into the crowd. While Crawley stated that she did not see defendant involved in the fight, she did not definitively state that defendant was somewhere else and could not have been fighting, like Evans asserted in her affidavit. Even accepting as true Crawley's statements, the jury could have believed that defendant was involved in the fight but that Crawley simply did not see him. Thus, defense counsel's failure to request a continuance to obtain Crawley's trial testimony would not have affected the outcome of the proceedings, and therefore did not amount to ineffective assistance. See *Steading*, 308 Ill. App. 3d at 938-40.

¶ 91 Because neither Singleton's nor Crawley's testimony would have changed the result of defendant's trial, defendant failed to make a substantial showing of ineffective assistance of counsel. We, therefore, affirm the trial court's dismissal of this claim.

¶ 92                                   3. *Failing to Impeach Hanneman*

¶ 93 "The impeachment of witnesses is generally considered a matter of trial strategy, immune from claims of ineffective assistance of counsel." *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 58. "[N]either mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent." *People v. Vera*, 277 Ill. App. 3d 130, 138 (1995).

¶ 94                                   a. Hanneman's Guilty Pleas

¶ 95 In his petition, defendant asserted that his counsel was ineffective for failing to impeach Hanneman's testimony that his charges of burglary and possession of a controlled substance were "pending." Defendant asserted that this testimony was "false" because Hanneman "had already plead[ed] guilty to, and was just awaiting to be sentenced on those two charges." Defendant further asserted counsel's failure to impeach Hanneman prejudiced him because impeachment would "have effected [*sic*] Hanneman's credibility" and "changed the proceedings."

¶ 96 At trial, a witness can be impeached with prior criminal convictions. See *People v. Pecoraro*, 175 Ill. 2d 294, 309 (1997). Defendant argues that his trial counsel was ineffective because he failed to impeach Hanneman with his "convictions" for burglary and possession of a controlled substance because Hanneman pleaded guilty to those crimes approximately six months before defendant's trial. In support of his contention that Hanneman's guilty pleas constituted convictions for impeachment purposes, defendant cited the following language from the Illinois Supreme Court: "A guilty plea is an admission of guilt and a conviction in and of itself." *People*

*v. Reed*, 2020 IL 124940, ¶ 27 (citing *People v. White*, 2011 IL 109616, ¶ 17) ("The plea obviates the prosecution's burden of proof. It supplies both evidence and verdict, ending controversy." (Internal quotation marks omitted.))).

¶ 97    The supreme court's statements in *Reed* were made in discussing the consequences of a guilty plea, and the court's statements in *White* were related to the need for a factual basis to support a guilty plea. Those statements were not made in the context of whether guilty pleas could be used for impeachment purposes at trial, and there are no supreme court cases addressing that issue. However, our appellate court has ruled that a guilty plea does "not constitute a conviction for purposes of impeachment." See *People v. Salem*, 2016 IL App (3d) 120390, ¶ 47. The Third District explained: "[W]hile a guilty plea is an admission of guilt, such an admission of guilt does not become a final judgment of conviction until the court imposes a sentence, either by agreed disposition or following a sentencing hearing." *Salem*, 2016 IL App (3d) 120390, ¶ 45. In reaching its conclusion, the Third District relied on (1) a section of the Criminal Code of 1961 defining a "conviction" (720 ILCS 5/2-5 (West 2010)) and a section of the Code of Criminal Procedure of 1963 defining a "judgment" (725 ILCS 5/102-14 (West 2010)), (2) supreme court case law establishing that "[t]he final judgment in a criminal case is the sentence" (*People v. Allen*, 71 Ill. 2d 378, 381 (1978) (citing *People v. Warship*, 59 Ill. 2d 125, 130 (1974))))," and (3) Illinois Supreme Court Rule 606(b) (eff. Mar. 20, 2009), which provides that "a defendant cannot appeal his criminal case until final judgment is entered." *Salem*, 2016 IL App (3d) 120390, ¶ 45.

¶ 98    Here, the documents attached to defendant's postconviction petition showed that Hanneman pleaded guilty to burglary and possession of a controlled substance approximately six months before defendant's trial but was not sentenced for those crimes until after defendant's trial. Thus, at the time of defendant's trial, Hanneman did not have "convictions" that defense counsel

could use to impeach Hanneman. See *Salem*, 2016 IL App (3d) 120390, ¶ 47. Consequently, defense counsel's failure to impeach Hanneman with his guilty pleas was not deficient performance. We affirm the trial court's dismissal of this claim.

¶ 99                                b. Hanneman's Drug Addiction

¶ 100          Defendant also alleged that his counsel was ineffective for failing to impeach Hanneman about his drug addiction. Defendant attached to his postconviction petition several police reports wherein officers documented that Hanneman reported being a "drug addict" and/or had a "drug problem." Defendant contends that his counsel should have used those statements to impeach Hanneman's testimony that he was not a drug addict but merely a recreational drug user.

¶ 101          "Impeachment is not evidence." *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 44. The purpose of impeachment is to attack the credibility of the witness. *Robinson*, 2020 IL 123849, ¶ 69; see *Tucker*, 2017 IL App (5th) 130576, ¶ 44 ("Impeachment simply challenges the credibility of the witness."). Where defense counsel impeaches a witness, the question of the witness's credibility is left to the jury. *Tucker*, 2017 IL App (5th) 130576, ¶ 44. A defendant cannot make a substantial showing of ineffective assistance of counsel by noting counsel's failure to impeach the witness more. See *Tucker*, 2017 IL App (5th) 130576, ¶ 44; see also *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 47 ("[A] court of review will not upset a verdict by a jury on the possibility, not probability, that with a little bit more impeachment, the witness would have been found totally incredible.").

¶ 102          There are many ways to impeach a witness to attack their credibility. Evidence of drug addiction is admissible to impeach a witness's ability to perceive, recall, or testify and also to impeach a witness's general honesty and integrity. *People v. Kegley*, 227 Ill. App. 3d 48, 54 (1992). Additionally, "evidence of habitual drug use is a significant factor in evaluating witness

credibility not only because it evinces a generally dishonest character, but also because it is particularly probative of the witness's abilities to perceive and recall accurately." *People v. Di Maso*, 100 Ill. App. 3d 338, 342 (1981). Defense counsel can cross-examine a State's witness about drug use to tarnish the witness's credibility. See *People v. Carter*, 2020 IL App (3d) 170745, ¶ 22.

¶ 103     That a witness has been convicted of a crime does not disqualify him from testifying in a criminal case, but a "conviction may be shown for the purpose of affecting the credibility of the witness." 725 ILCS 5/115-16 (West 2022). Here, the jury was instructed that it could consider "that a witness has been convicted of an offense *** as it may affect the believability of the witness." Illinois Pattern Jury Instructions, Criminal, No. 3.12 (approved 4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.12).

¶ 104     While only actual convictions can be used to attack the character of a witness, that a witness has been charged with a crime "may be shown or inquired into where it would reasonably tend to show that his [or her] testimony might be influenced by interest, bias or a motive to testify falsely." (Internal quotation marks omitted.) *People v. Myles*, 2020 IL App (1st) 171964, ¶ 21. "The fact that a witness *** has pending charges may be used to impeach the witness by showing that he or she is motivated to assist the prosecution in order to receive leniency in his or her own case." *Myles*, 2020 IL App (1st) 171964, ¶ 21.

¶ 105     Here, defendant's allegations do not support a claim of ineffective assistance of counsel for failure to impeach. At defendant's trial, defense counsel extensively cross-examined Hanneman about his pending convictions, drug use, and prior drug conviction. As a result of defense counsel's questioning, Hanneman admitted that he (1) had charges pending in "drug court" that included "possession of a controlled substance," (2) was being prosecuted by the same entity

that was prosecuting defendant, (3) had previously been charged with, convicted of, and placed on probation for "controlled substance charges," and (4) used drugs.

¶ 106 Defense counsel thus impeached Hanneman's credibility in three ways: (1) establishing that he was a drug user (see *Carter*, 2020 IL App (3d) 170745, ¶ 22; *Di Maso*, 100 Ill. App. 3d at 342); (2) showing that he had charges pending against him in Peoria County and was motivated to assist the prosecution to receive leniency in his own cases (see *Myles*, 2020 IL App (1st) 171964, ¶ 21); and (3) evoking Hanneman's admission that he had previously been convicted of "controlled substance charges," which the jury could consider in analyzing Hanneman's believability (see IPI Criminal 4th No. 3.12).

¶ 107 Because defense counsel thoroughly cross-examined Hanneman and called into question Hanneman's credibility based on his drug use, prior drug conviction, and charges pending against him, counsel's failure to impeach Hanneman with statements he made to police about being addicted to drugs did not prejudice defendant. See *Douglas*, 2011 IL App (1st) 1093188, ¶ 47. The jury was fully informed of the reasons why it should not accept Hanneman's testimony, and defense counsel even reminded the jury of those reasons in his closing argument. Thus, defendant's allegations fail to make a substantial showing of ineffective assistance, and the trial court properly dismissed this claim. See *Tucker*, 2017 IL App (5th) 130576, ¶ 44.

¶ 108 D. Unreasonable Assistance of Postconviction Counsel

¶ 109 Defendant's final contention is that he was denied reasonable assistance from postconviction counsel where counsel did not (1) attach affidavits from potential witnesses or explain why such affidavits were not attached, (2) show that certain supporting documents were authentic, and (3) present claims in proper legal form.

¶ 110 "In a postconviction proceeding, there is no constitutional right to the assistance of

counsel." *People v. Addison*, 2023 IL 127119, ¶ 19. Instead, pursuant to the Act, postconviction petitioners are entitled to "a 'reasonable' level of assistance." *People v. Flores*, 153 Ill. 2d 264, 276 (1992). To ensure that postconviction petitioners receive that level of assistance, Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) requires postconviction counsel to file with the court a certificate showing that "the attorney has consulted with petitioner by phone, mail, electronic means or in person to ascertain his or her contentions of deprivation of constitutional rights, has examined the record of the proceedings at trial, and has made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions."

¶ 111　　　　　When postconviction counsel files a Rule 651(c) certificate, a rebuttable presumption of reasonable assistance arises. *Addison*, 2023 IL 127119, ¶ 21. "The defendant bears the burden of overcoming that presumption by showing that postconviction counsel did not substantially comply with the requirements of the rule." *Addison*, 2023 IL 127119, ¶ 21. The defendant may do so by demonstrating that postconviction counsel did not make all necessary amendments to the *pro se* petition, including amendments that are necessary to overcome procedural bars. *Addison*, 2023 IL 127119, ¶ 21.

¶ 112　　　　　　　　　　　　　1. *Affidavits*

¶ 113　　　　　"[A] trial court ruling upon a motion to dismiss a post-conviction petition which is not supported by affidavits or other documents may reasonably presume that post-conviction counsel made a concerted effort to obtain affidavits in support of the post-conviction claims, but was unable to do so." *People v. Johnson*, 154 Ill. 2d 227, 241 (1993). To overcome this presumption, the defendant must present contradictory evidence from the record. *People v. Johnson*, 2024 IL App (5th) 220151-U, ¶ 33. If the defendant fails to cite any evidence in the record to refute the presumption, the defendant cannot show that postconviction counsel rendered

unreasonable assistance in failing to obtain and attach affidavits of potential witnesses. *Johnson*, 2024 IL App (5th) 220151-U, ¶ 33.

¶ 114　　　　Here, defendant's postconviction counsel filed a Rule 651(c) certificate, and defendant has not established that counsel failed to substantially comply with the requirements of the rule. While counsel did not attach affidavits from Singleton, Crawley, McGee, Shawn Joiner, and Tyrell Joiner to the amended postconviction petition, counsel attached an affidavit from Evans and a police report establishing what Crawley's trial testimony would have been. We can presume that postconviction counsel made efforts to obtain affidavits from the other individuals but was unable to do so, as defendant has pointed to no evidence from the record to show otherwise. See *Johnson*, 154 Ill. 2d at 241; see also *Johnson*, 2024 IL App (5th) 220151-U, ¶ 33 (finding the defendant did not show unreasonable assistance where he did not "cite to any portion of the record that would contradict the presumption that postconviction counsel made a concrete effort to obtain the affidavits of the two witnesses but was unable to do so"). Thus, defendant cannot establish unreasonable assistance for counsel's failure to attach additional affidavits.

¶ 115　　　　　　　　　　　　　2. *Documents*

¶ 116　　　　Defendant also cannot establish unreasonable assistance based on counsel's failure to show the authenticity of documents attached to the postconviction petition. The State never called into question the authenticity of those documents, and we have relied on those documents to examine the sufficiency of defendant's postconviction claims. Thus, defendant has failed to establish that postconviction counsel's alleged failure in this regard amounted to unreasonable assistance.

¶ 117　　　　　　　　　　　　　3. *Claims*

¶ 118　　　　Finally, the record contradicts defendant's contention that postconviction counsel

did not present defendant's claims in proper legal form. Defendant's *pro se* postconviction petition contained more than 20 claims. The amended postconviction petition filed by postconviction counsel incorporated defendant's *pro se* petition and added additional allegations to shape defendant's claims into proper legal form. For example, defendant's *pro se* claim of ineffective assistance based on counsel's failure to seek a continuance did not adequately allege prejudice because it merely stated counsel's failure to call certain witnesses "changed the course of the proceedings." However, in the amended petition, counsel adequately alleged prejudice by stating that counsel's failure "changed the outcome" of the proceedings, an essential requirement of an ineffective-assistance claim. See *People v. Johnson*, 2021 IL 126291, ¶ 52 ("To establish prejudice, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different."). Because the record shows that postconviction counsel added allegations to the amended postconviction petition to ensure that defendant's claims were in proper legal form, defendant's claim of unreasonable assistance lacks merit.

¶ 119 Here, the record establishes that postconviction counsel rendered reasonable assistance; we therefore affirm the trial court's dismissal of this claim.

¶ 120        III. CONCLUSION

¶ 121 For the reasons stated, we affirm in part and reverse in part the order dismissing defendant's postconviction petition at the second stage and remand for the trial court to conduct third-stage proceedings on defendant's claims of actual innocence and ineffective assistance of counsel for failure to interview and subpoena Evans, defendant's alibi witness.

¶ 122 Affirmed in part and reversed in part; cause remanded.