**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 190178-U

Order filed June 8, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0178 Circuit No. 14-CF-378 |
| | ) | |
| SEAN TYRONE WALLS, | ) ) | Honorable Paul Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Davenport concurred in the judgment.
Justice Hettel dissented.

_____

**ORDER**

¶ 1    *Held*:  The circuit court erred by summarily dismissing the petitioner's postconviction petition as frivolous and patently without merit because the petition stated an arguable claim of ineffective assistance of counsel.

¶ 2    Following a jury trial, the defendant, Sean Tyrone Walls, was convicted of two counts of first-degree murder and sentenced to 50 years' imprisonment. This court affirmed the defendant's conviction and sentence on direct appeal. The defendant subsequently filed a *pro se* petition for

postconviction relief, which the trial court summarily dismissed at the first stage of postconviction proceedings. The defendant appeals.

¶ 3                                    I. BACKGROUND

¶ 4        The defendant was charged with first-degree murder in the shooting death of Derrick Booth, Jr. The shooting occurred during a party in Peoria. Derrick died from a single gunshot wound to his chest.

¶ 5        The State's theory at trial was that the defendant and Derrick argued before the shooting and the defendant shot Derrick after Derrick refused to sell the defendant marijuana at a certain price. The State also suggested robbery as a possible motive. The defendant presented a hybrid defense of accident and self-defense. He claimed that Derrick pulled out a gun, they scuffled, and the gun went off.

¶ 6        The State presented the testimony of three witnesses to the shooting. Britiss Burks testified that, as she walked back into the house, she passed the defendant and Derrick on the porch. She heard them arguing and saw the defendant grab Derrick around his neck. Derrick was trying to get away but could not because he was being held by the defendant, and Derrick "was not doing anything" to the defendant. Britiss saw Derrick "trying to fight" and then "all [she] heard was a gunshot" and then saw him on the ground. Britiss did not see who fired the gun. She did not see Derrick with a gun anytime that day or night. When she was taken to the police station after the incident, Britiss identified the defendant as the shooter from a photo lineup.

¶ 7        Jasmine Burks testified that, as she was walking into the house, she saw the defendant, Derrick, and the defendant's girlfriend, LaKisha Hinkle (Kisha), on the porch arguing. Jasmine was inside the house for "no less [than] three or five seconds" and, as she ran back out, she heard

2

Derrick say, "You're not going to get my money." Then, according to Jasmine, the defendant "pulled out the gun and shot [Derrick] in the chest," and Derrick fell to the ground.

¶ 8 Five days after the shooting, Jasmine told the police that she had seen the defendant shoot Derrick. Jasmine testified that, when she initially identified herself to the police, she used a false last name because she had a warrant in a traffic case. She later served five days in jail for that case. Jasmine testified that she "did not get anything from the State" on her traffic ticket. She admitted that, when she was speaking on a "jail line," she said that she did not see anything. She stated that she made that statement because she was scared.

¶ 9 Tracina Jones testified that, as she was leaving the party, she saw the defendant and Shondre Johnson standing at the front door. There was a "small little commotion going on, a little argument." Shondre said, "Man, leave it alone. It's nothing. Just go on or whatever." She figured he was talking to the defendant, but she could not see who else was on the porch at the time. Tracina stated, "it looked like [the defendant] reached and started grappling with Derrick's arm." According to Tracina, the defendant and Derrick were "more than an arm's length but not super far away" from each other. Tracina saw a flash and both the defendant and Derrick fell down. She did not see a gun in the defendant's hand.

¶ 10 The State also presented witness testimony supporting its theory that the defendant had a gun immediately prior to the shooting and shot Derrick after the two argued over marijuana prices. Latisha Bailey testified that she was playing cards in the living room with several people when she saw Kisha hand the defendant a Crown Royal bag containing a small, black gun. Latisha testified that, just before the shooting, she asked Derrick about a "2 for 15" deal for marijuana. (Tracina testified that "2 for 15" meant two "loud blunts" containing quality marijuana, which generally sold for $10 each). Derrick responded that he "wasn't going to keep giving out deals," and the

3

defendant walked back into the kitchen. Latisha testified that she heard a gunshot approximately 45-90 seconds later. Latisha then saw a man who could have been the defendant (based on his build) running from the scene, and she fired shots at him. Latisha was on probation at the time she testified. Her probation status was not revealed to the jury.

¶ 11    Angela Warfield testified that she was in the living room playing cards at approximately 2:00 a.m. with Latisha and others. Kisha was sitting in a chair next to Angela. Kisha had a Crown Royal bag in her hand. The defendant approached Kisha, said "[l]et me get that," and Kisha handed him a black handgun from the bag. Angela heard the shooting approximately two minutes later.

¶ 12    Britiss testified that, early in the party, the defendant asked Derrick to sell him marijuana, Derrick refused, and the defendant immediately bought marijuana from someone else. At one point, she saw Derrick pull out hundreds of dollars in cash from his pocket.

¶ 13    Tracina testified that she was also trying to buy marijuana at the party. According to Tracina, the defendant told her that Derrick was funny about his weed, and that "he was supposed to have weed and he wouldn't give nobody 2 for 15, wouldn't give nobody no play for no weed or whatever."

¶ 14    Kisha testified that she saw Derrick walk across the street to a house on the corner and then come out of the house with a gun in his pocket. She saw Derrick walk onto the porch. The defendant came out and words were exchanged. Derrick pulled out a gun, the defendant reached for it, the defendant and Derrick wrestled over the gun, and a gunshot went off.

¶ 15    Breanna Kelly, Kisha's sister, testified that, prior to the shooting, she saw Derrick go to a house "catty-corner by the stop sign." When Derrick came back toward the party, he "seemed to be kind of angry," and he had his hands in his pocket like he had something. Breanna saw the defendant and Derrick "tussling for the gun" and Derrick hit the ground, and she heard a "pow."

4

After the shooting, Breanna told the police that she saw Derrick go into a car parked across the street and, when he came back, it looked like he was carrying a gun.

¶ 16 Leharold Washington also testified for the State. Leharold claimed that he spoke with the defendant about the incident when the two men were in jail together, and the defendant confessed to shooting Derrick. Leharold testified that the defendant told him that he pulled out a gun and shot Derrick when Derrick lunged at him during an argument. When Leharold asked the defendant what he was going to do, the defendant responded that he would say that Derrick pulled out the gun, the two tussled over it, and it went off.

¶ 17 At the time Leharold came forward with his story, he was charged with four drug offenses in two separate cases. He pleaded guilty to one of the charges, but the other three, including the two most serious charges, were dropped. Leharold testified that the State dismissed one "case" of unlawful possession in exchange for his assistance in the defendant's case. The prosecutors did not correct Leharold and did not explain to the jury that the two most serious charges against Leharold were dropped.

¶ 18 Officer John Williams of the Peoria Crime Scene Investigation Unit arrived at the scene shortly after the shooting. Williams testified that a bag of personal items was recovered from Derrick's body. The contents of the bag included fourteen dollars in cash but no large sums of money or cannabis.

¶ 19 Dr. John Denton, the forensic pathologist who performed Derrick's autopsy, testified for the State. Dr. Denton testified that Derrick had a gunshot wound mid-chest, about 15 inches from the top of the head in the midline. The entrance wound was slightly oval, with a "rim of abrasion or scraping around it" which was "angled up towards [Derrick's] right shoulder." According to Dr. Denton, this corresponded with the path of the bullet, which he determined to be "front to back,

5

right to left, and fairly sharply downwards." Because there was no visible evidence of gunpowder on Derrick's bloody t-shirt or skin, Dr. Denton concluded that the gun was not at close range. Based on this conclusion, Dr. Denton opined that the gunshot wound was not inflicted as the result of a struggle over a gun. No evidence was presented with respect to whether Derrick's t-shirt was chemically tested for the presence of gunpowder.

¶ 20     Dr. Denton testified that, when a gun is fired at close range (*i.e.,* when the gun muzzle is within two feet of the entrance wound) "you can see small little stippling or tattooing of the gunpowder around the wound or on the outer clothing of the shirt." "Stippling" is caused by small particles of gunpowder or soot that are ejected when the gun is fired and that embed in the skin. Such particles or soot will usually be visible on the body. Dr. Denton testified that he did not see any stippling or soot on Derrick's body or the T-shirt he was wearing at the time of the shooting. Dr. Denton stated that, because there was no evidence of any kind of soot or gunpowder stippling or tattooing on the T-shirt overlying the sternum or on the skin around it, "there was no evidence of any kind of close range firing." Immediately after Dr. Denton testified about the absence of stippling, the prosecutor asked him whether it was his opinion that the muzzle of the gun fired at Derrick "was greater than 2 feet away from his body when it was fired." Dr. Denton responded, "[y]es, that is correct." The prosecutor then asked Dr. Denton whether the forensic evidence in this case supported the hypothetical that the shooter and Derrick were "struggling in hand to hand sort of combat over a gun" with their bodies touching at the time the gun was fired. Dr. Denton responded,

> "I would say the main — the main thing that does not support that is the evidence
> of no close range firing, so there's no soot or stippling on the T-shirt or on the skin

6

so that the muzzle of the gun by my examination has to be 2 feet away or greater when it's fired. So struggling over a gun is inconsistent with what I found."

¶ 21     Dr. Denton also opined that the angle or trajectory of the bullet as it passed through Derrick's body was inconsistent with a struggle. He repeatedly stated that one basis for that opinion was the fact that the gun muzzle had to be at least two feet away from the entry wound at the time the shot was fired. However, it was unclear whether Dr. Denton concluded that the gun had to be at least two feet away due solely to the absence of stippling or whether he believed that the angle of the bullet provided independent evidence of that fact.

¶ 22     Dr. Denton co-authored an article in 2006 which stated, in part, that it is "absolutely critical" for a forensic pathologist to recognize that "the absence of soot or stippling does not absolutely mean that the wound was not fired from close range" because stippling and soot could be "screened out" by intermediate targets or clothing. The article further advised that clothing be tested for the presence of gunpowder residue. The defendant's counsel did not impeach Dr. Denton with the article. Contrary to the court's suggestion, the article was not included in the trial record.

¶ 23     The defendant testified in his own defense. He stated that, shortly before the shooting, he saw Derrick leave the party and go into a house across the street. The defendant later saw Derrick exit the house and walk back toward the party carrying what he believed to be a gun. Derrick then confronted him and pulled out a gun. They struggled over the gun, and it went off.

¶ 24     The defendant admitted that he ran away after the shooting and broke into an abandoned building where he was "laying low." He testified that he burned the clothes he was wearing and kicked them down the sewer. He admitted that he cut his hair before turning himself in to the police.

¶ 25    During closing argument, the prosecutor characterized Latisha as an unbiased witness who "had no skin in this game." The State told the jury Latisha did not know Derrick, had "no ax to grind" with the defendant, and that she had "witnessed the steps leading up to a murder *** that didn't have to happen" and was not going to let it "get pushed under a rug." The prosecutor ended the rebuttal argument by characterizing Latisha as someone bravely taking a stand against gun violence in her community.

¶ 26    The defendant was convicted and sentenced to 50 years' imprisonment. On direct appeal, the defendant argued, *inter alia*, that he was entitled to a new trial because the prosecutor engaged in prosecutorial misconduct throughout closing and rebuttal arguments by repeatedly arguing facts not in evidence, misstating the nature of the evidence, misstating the law, vouching for the credibility of witnesses, and inflaming the passions of the jury. This court affirmed the defendant's conviction, with one Justice dissenting. *People v. Walls*, 2017 IL App (3d) 150481-U. Although the majority found that the prosecutor committed five clear and obvious errors during closing argument, it held that there was no reversible plain error because the evidence against the defendant was "overwhelming" and not closely balanced. The dissent opined that the defendant's conviction was reversible under the plain error rule, concluding that the case presented a "credibility contest" and the evidence against the defendant was not overwhelming. *Id.* ¶¶ 132-36.

¶ 27    The defendant subsequently filed a *pro se* postconviction petition. The petition alleged, *inter alia*, that defense counsel was ineffective for failing to challenge Dr. Denton's opinion testimony with the article he co-authored in 2006 and impeach Latisha with her probationary status. The petition further alleged that the prosecutors committed misconduct by: (1) failing to correct Leharold's testimony that the State dismissed only one charge against him, (2) failing to

disclose Latisha's probationary status, and (3) falsely characterizing Latisha as an unbiased witness during closing arguments.

¶ 28 The court summarily dismissed the petition at the first stage of postconviction proceedings. In rejecting the defendant's arguments, the court relied heavily on this court's decision in the defendant's direct appeal, including the conclusion that the evidence against the defendant was "overwhelming" and not closely balanced.

¶ 29 In dismissing the defendant's claim regarding counsel's failure to impeach Dr. Denton with the 2006 article, the court noted that Dr. Denton's testimony "was challenged on cross exam" and the article was "not significant" and "arguably part of the record in any event." The court, therefore, concluded that counsel's failure to confront Dr. Denton with the article was "a matter of trial strategy" and "did not prejudice [the defendant]."

¶ 30 The court also rejected the defendant's claim that his counsel improperly failed to impeach Latisha with her probationary status. Citing this court's opinion in the defendant's direct appeal, the court found this claim to be contradicted by the record. *Id.* ¶ 85 (in defense counsel's closing argument, counsel argued that Latisha was not a credible witness due to her prior criminal convictions). The court concluded that defense counsel was not deficient in his cross-examination of Latisha and that the outcome of the trial would not have been different if Latisha's probationary status had been disclosed.

¶ 31 The court rejected the defendant's claim that the prosecutor engaged in misconduct by failing to disclose Latisha's probationary status and by improperly characterizing Latisha as an unbiased witness. The court concluded that defense counsel was "obviously aware of [Latisha]'s conviction and did use this to impeach her credibility in closing argument." The court further found that the prosecutor's comments regarding Latisha during closing argument were "either a fair

9

comment on the evidence, and/or [were] previously discussed in the appellate court opinion and did not amount to error to the extent to warrant further proceedings herein."

¶ 32     The court found no merit in the defendant's arguments regarding Leharold's testimony. In the court's view, it did not matter that the jury was not informed of other charges against Leharold that had been dropped because "the jury was advised of the gist of the 'benefit of the bargain' [Leharold] received from the State which was available for impeachment and credibility challenge by the defense." The court further concluded that there was "no evidence that the State failed to disclose" the criminal conviction at issue, and "no argument" that defense counsel was ineffective for failing to impeach Leharold regarding this issue. The court ruled that, "just as the appellate court concluded there was no plain error regarding various improper arguments of the State," "so too, the record herein confirms" that the defendant's arguments are meritless because "the evidence in this case was not closely balanced" and "any 'error' in this regard, if at all, was not so fundamental and of the magnitude that it affected the fairness of the trial or challenged the integrity of the judicial process."

¶ 33     This appeal followed.

¶ 34                                              II. ANALYSIS

¶ 35     The defendant argues that the court erred in summarily dismissing his postconviction petition at the first stage of postconviction proceedings because his petition alleged arguable violations of his constitutional rights.

¶ 36     The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)) sets out a three-stage proceeding in which a criminal defendant may assert that his conviction resulted from a substantial denial of his rights under the United States Constitution, the Illinois Constitution, or both. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). At the first stage, the court must accept as true and

liberally construe all the allegations in the petition unless they are contradicted by the record. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). A defendant need only allege sufficient facts to state the "gist" of a constitutional claim in order for his petition to be forwarded to the second stage. *Hodges*, 234 Ill. 2d at 9.

¶ 37    The first stage of postconviction proceedings "presents a 'low threshold' [citation], requiring only that the petitioner plead sufficient facts to assert an arguably constitutional claim." *People v. Brown*, 236 Ill. 2d 175, 184 (2010) (quoting *People v. Jones*, 211 Ill. 2d 140, 144 (2004)). A postconviction petition may be summarily dismissed at the first stage only if the trial court determines that the petition is frivolous or patently without merit. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002); 725 ILCS5/122-2.1(a)(2) (West 2018). A petition is frivolous or patently without merit if it "has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id*. The existence of one arguable claim of a constitutional violation warrants advancing the entire petition to the second stage of postconviction review. *People v. Rivera*, 198 Ill. 2d 364 (2001).

¶ 38    We review the court's summary dismissal of the defendant's *pro se* postconviction petition *de novo*. *Brown*, 236 Ill. 2d at 184.

¶ 39    The defendant argues that his counsel rendered ineffective assistance by, *inter alia*: (1) failing to confront Dr. Denton with his 2006 article, which undermined his opinion that the shooting could not have occurred during a struggle; and (2) failing to impeach Latisha with the fact that she was on probation at the time she testified.

¶ 40    A defendant has a constitutional right to the effective assistance of counsel. *People v. Agee*, 85 Ill. App. 3d 74, 82 (1980); U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Ineffective

11

assistance of counsel claims are governed by the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Id.* at 687. More specifically, the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, at the first stage of post-conviction proceedings, a petition alleging ineffective assistance of counsel may not be summarily dismissed if: (1) it is *arguable* that counsel's performance fell below an objective standard of reasonableness, and (2) it is *arguable* that the defendant was prejudiced. *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010); *Hodges*, 234 Ill. 2d at 17.

¶ 41            The defendant's postconviction petition pleads sufficient facts to assert an arguable claim of ineffective assistance of counsel. Defense counsel failed to confront Dr. Denton with a published article that he co-wrote in 2006. Although the article notes that "[t]he principal indicator of close range fire is stippling," it states that it is "absolutely critical" for a forensic pathologist to recognize that "the absence of soot or stippling does not absolutely mean that the wound was not fired from close range" because stippling and soot could be "screened out" by intermediate targets or clothing "even when the muzzle of the gun is pressed up against the clothing." These statements undermine Dr. Denton's testimony that the absence of stippling on Derrick's body established that the muzzle of the gun was at least two feet away from the defendant when it was fired. That testimony directly refuted the central basis of the defendant's defense, *i.e.*, that the gun went off during a struggle between the defendant and Derrick. If defense counsel had confronted Dr. Denton with the article, it could have rendered the basis of his medical opinion less credible.

12

¶ 42      Dr. Denton was a critical witness for the State. He was the only medical expert to testify and the only expert to render opinions based upon on the condition of Derrick's body after the shooting. His testimony presented the most compelling physical evidence in the case and the most powerful refutation of the defense's theory of how the shooting occurred. As such, Dr. Denton's opinions carried enormous weight. Anything that called into question the basis of his opinions could certainly have influenced the outcome of the trial. Challenging Dr. Denton's opinions with his own words from the 2006 article could have been effective in that regard.

¶ 43      The State argues that the presentation of the 2006 article would not have changed the result of the trial because Dr. Denton's opinion regarding the range of fire was not based entirely on the absence of stippling. The State maintains that Dr. Denton also opined that the angle of the bullet's path through Derrick's body suggested that the muzzle had to be at least two feet away when the gun was fired. However, while Dr. Denton did discuss the angle of the bullet and how it related to his conclusion that there was not a struggle, his analysis was based, at least in part, on the assumption that the gun was more than two feet away when it was fired. He arguably made that assumption because he had already determined the range of fire based on the absence of stippling.

¶ 44      Moreover, even assuming that the angle of the bullet provided an independent basis for Dr. Denton's opinion, the 2006 article would have undermined his reliance on the absence of stippling, which Dr. Denton stated was the "main thing" that ruled out a close-range shooting during a struggle. During closing argument, the prosecutor relied heavily on the absence of stippling to establish that there was no struggle. Four out of five of the occurrence witnesses testified that the gun went off when Derrick and the defendant were engaged in a struggle. Had Dr. Denton's opinions regarding the absence of stippling been challenged more effectively, the jury could have

13

been more likely to credit their testimony and to accept the defense's theory that Derrick was shot accidentally during the struggle and not because the defendant intentionally fired the gun.

¶ 45 Defense counsel's failure to adequately challenge Dr. Denton's conclusion on this critical issue at least arguably supports a claim that his counsel rendered objectively deficient performance and that the defendant was prejudiced as a result. The potentially prejudicial impact was arguably compounded by counsel's failure to impeach Latisha with her probationary status and Leharold by identifying the serious charges that were dropped in exchange for his testimony. Accordingly, the defendant adequately stated the gist of a constitutional claim, and his petition was not frivolous and patently without merit. The court erred by summarily dismissing the petition.

¶ 46 The court relied on the fact that, in its opinion affirming the defendant's direct appeal, this court found that the evidence against the defendant was "overwhelming" and was not closely balanced. In similar fashion, the State argues that the defendant's allegations regarding counsel's ineffectiveness cannot establish prejudice because the evidence against him was overwhelming and not closely balanced. Both the circuit court and the State have applied an incorrect legal standard. This court's prior finding that the evidence presented against the defendant at trial was overwhelming does not control the outcome of this postconviction proceeding because the defendant is alleging that important information and impeachment critical to the case was not available to the jury. This court did not consider these issues when evaluating the weight of the evidence.

¶ 47 Moreover, this court determined that the evidence presented at trial was not closely balanced in the context of deciding the defendant's claim for reversal under the plain error doctrine. The legal standard applicable to that claim is far stricter than the standards governing first-stage postconviction proceedings. The only questions before us in this case are whether defense

14

counsel's performance was *arguably* deficient and whether the defendant was *arguably* prejudiced thereby.

¶ 48        The defendant's petition raised several other claims. Because the existence of one arguable claim of a constitutional violation warrants advancing the entire petition to the second stage of postconviction review (*Rivera*, 198 Ill. 2d 364), we do not address the defendant's other claims.

¶ 49                                    III. CONCLUSION

¶ 50        We reverse the judgment of the circuit court of Peoria County and remand the matter to the circuit court for second stage postconviction proceedings.

¶ 51        Reversed; cause remanded.

¶ 52        JUSTICE HETTEL, dissenting:

¶ 53        I respectfully dissent from the majority's holding that defendant set forth the gist of a constitutional claim where defense counsel did not use Dr. Denton's 2006 article to impeach his testimony that the gun must have been fired from at least two feet away.

¶ 54        In postconviction proceedings, the circuit court may summarily dismiss a petition as frivolous and patently without merit only if its ineffective assistance of counsel claims have "no arguable basis either in law or in fact." Hodges, 234 Ill. 2d at 11-12. A petition lacks an arguable legal basis when it is based on an indisputable meritless legal theory, such as one that is "completely contradicted by the record." Id. at 16. A petition lacks an arguable factual basis when it is based on allegations that are delusional or belied by the record from the original trial proceedings. Id. at 13; see also People v. Torres, 228 Ill. 2d 382, 394 (2008) ("this court has consistently upheld the dismissal of a postconviction petition when the allegations are contradicted by the record from the original trial proceedings").

¶ 55        In 2006, Dr. Denton co-authored an article in which he stated:

15

¶ 56    "The principle [*sic*] indicator of close range fire is stippling, that is, a pattern of tiny, punctuate abrasions in the skin surround the entrance wound. *** The presence of stippling indicates that the muzzle of the gun was within 2 feet of the victim's body when it was discharged. Contact range firing occurs when the muzzle of the gun is in contact with the skin at the time of discharge. *** These wounds are often characterized by a dense pattern of combusted gun power reside or soot within and around the wound margin. Contact range gunshot wounds are no exception to the general rule that entrance wounds have a margin of abrasion, but the margin of abrasion in a contact wound may be seared or charred. ***. A muzzle imprint is not an uncommon finding and is virtually pathognomonic of a contact range gunshot wound. As noted earlier, stellate patterns of tearing, especially over bony surfaces, are not unusual.

¶ 57    Distant range gunshot wounds, that is, wounds inflicted when the muzzle of the gun is more than 2 feet away, will show no evidence of soot or stippling. It is absolutely critical that the forensic pathologist recognizes that the absence of soot or stippling does not absolutely mean that the [gun] was not fired from close range. Intermediate targets and clothing can screen out stippling and soot even when the muzzle of the gun is pressed up against the clothing. ***." J. Scott Denton, MD; Adrienne Segovia, MD; James A. Filkins, MD, JD, PhD; Practical Pathology of Gunshot Wounds (Archives of Pathology & Laboratory Medicine, Vol. 130, September 2006).

¶ 58    Defendant claims that defense counsel's failure to use this article to challenge Dr. Denton's opinion that the lack of stippling in this case lead him to conclude that the gun was not fired from close range resulted in ineffective assistance. He maintains that had counsel challenged Dr. Denton's testimony with his own words from the 2006 article, the jury might have questioned Denton's conclusion about the range of fire and concluded that Derrick was shot

16

during a struggle, as defendant suggested. His claims, however, are completely contradicted by the record.

¶ 59     First, the trial record clearly demonstrates that defense counsel's cross-examination of Dr. Denton was not deficient. Counsel aggressively challenged Denton's opinion that the gun was fired from at least two feet away, and Denton eventually agreed with counsel that it was possible that defendant fired the gun during a struggle with Derrick, assuming certain variables. Further, nothing in the trial record or in defendant's postconviction petition indicates that the article was available at the time of trial. Defendant does not claim that the article was produced in discovery or that counsel otherwise knew about the article and chose not to use it to impeach Denton. His conclusory allegations that counsel "could have easily found" the article published in a medical journal nine years before the trial and "should have used it" are insufficient to warrant second stage proceedings. See Torres, 228 Ill. 2d at 394 (noting that nonfactual and nonspecific assertions are insufficient to overcome summary dismissal of a postconviction petition); see also People v. Delton, 227 Ill. 2d 247, 254 (2008) ("a 'limited amount of detail' does not mean that a pro se petitioner is excused from providing any factual detail at all surrounding the alleged constitutional deprivation").

¶ 60     Assuming, arguendo, that the allegations are sufficient, if true, to establish that defense counsel's performance was deficient, defendant must still allege facts to create an arguable question of prejudice. See Hodges, 234 Ill. 2d at 17. In other words, defendant must show that, but for counsel's unprofessional error, the result of the trial would have been different. See Strickland, 466 U.S. at 694.

¶ 61     The article, which defendant attached to his petition, states a pathologist should recognize that the absence of soot and stippling does not rule out the possibility that the gun was fired from

17

close range and encourages the consideration of intermediate targets, such as clothing. The article also emphasizes that a muzzle imprint and stellate patterns of tearing are typical of a contact range gunshot wound. At trial, Dr. Denton testified that he examined Derrick and his clothing and found no soot or stippling and no evidence of close-range firing. He stated that, in his opinion, a struggle over the gun was inconsistent with what he found. He then referred to several pieces of evidence that supported that conclusion—the angle of the entry wound, the lack of soot on Derrick's hands and fingers, and the lack of any bruising that would otherwise indicate a struggle. Dr. Denton used all of this evidence to conclude that the gun was fired from at least two feet away from the victim. Contrary to defendant's allegations, Denton did not simply rely on the fact that there was no soot or stippling on Derrick's body to conclude that the gun was not fired from close range.

¶ 62        Moreover, a full reading of the entire article reveals that it supported, if not bolstered, Dr. Denton's testimony. The article emphasizes that, in general, the lack of soot and stippling indicates that a gun was not fired from close range but notes that the lack of stippling is not conclusive evidence that it was not. It then encourages pathologists to use other methods of evaluation before concluding that the gun was not fired from close range. At trial, Dr. Denton followed his own advice. He provided a detailed explanation of the range of fire, using other evidence in support of his conclusion that the gun was fired from at least two feet away. Since Dr. Denton's testimony was not inconsistent with his statements in the 2006 article, defendant failed to demonstrate, even arguably, that the outcome of the trial would have been different had the article been introduced.

¶ 63        As the majority notes, the first stage of postconviction proceedings presents a low threshold. Supra ¶ 37. However, to survive summary dismissal, a defendant is required to set

18

forth the gist of a constitutional claim. The petition must set forth some facts that would, if true, support a finding that counsel's performance was unreasonable and support a finding of prejudice. Defendant's petition did not meet that threshold.

¶ 64    In light of the foregoing, I would find defendant's ineffective assistance claim pertaining to counsel's failure to challenge Dr. Denton's testimony frivolous and patently without merit. I also find defendant's other ineffective assistance claims regarding counsel's failure to investigate who lived in the house across the street and to impeach Latisha with her probation status frivolous and patently without merit. In addition, I would find defendant's claims of prosecutorial misconduct insufficient to overcome summary dismissal. I would therefore affirm the trial court's judgment dismissing defendant's postconviction petition at the first stage of the proceedings.