NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241263-U

NO. 4-24-1263

IN THE APPELLATE COURT

FILED
October 2, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| SEAN T. WALLS, | ) | No. 14CF378 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine S. Gorman, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Harris and Justice Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, finding the trial court did not err by dismissing
defendant's postconviction petition at the second stage of proceedings where he
failed to make a substantial showing of a constitutional violation.

¶ 2    In February 2015, a jury found defendant, Sean T. Walls, guilty of first degree

murder (720 ILCS 5/9-1(a)(1), (2) (West 2014)), and the trial court sentenced him to 50 years'

imprisonment. Defendant appealed, and the appellate court affirmed his conviction and sentence.

*People v. Walls*, 2017 IL App (3d) 150481-U, ¶ 130. In December 2018, defendant filed a *pro se*

postconviction petition, which the trial court summarily dismissed. Defendant appealed, and the

appellate court reversed the dismissal and remanded for second-stage proceedings. *People v.*

*Walls*, 2023 IL App (3d) 190178-U, ¶ 50. On remand, the trial court appointed postconviction

counsel to represent defendant, and counsel filed an amended postconviction petition. In

September 2024, the court entered a written order dismissing the amended petition for failing to

make a substantial showing of a constitutional violation. Defendant appealed.

¶ 3        On appeal, defendant asserts his postconviction petition made a substantial showing of ineffective assistance of trial counsel based on counsel's failure to (1) impeach three of the State's witnesses and (2) investigate whether the victim had a connection with 818 South Greenlawn Avenue in Peoria, Illinois. Alternatively, defendant claims the petition made a substantial showing that he was prejudiced by the cumulative effect of counsel's alleged errors. For the reasons that follow, we affirm.

¶ 4                                I. BACKGROUND

¶ 5        In June 2014, a grand jury indicted defendant on two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2014)) for the shooting death of Derrick Booth Jr. The shooting occurred during a party at 813 South Greenlawn Avenue. The victim died from a single gunshot wound to the chest.

¶ 6                                A. Jury Trial

¶ 7        In February 2015, the matter proceeded to a jury trial.

¶ 8                                1. *Britiss Burks*

¶ 9        Britiss Burks testified she had been friends with the victim since her freshman year of high school. She saw the victim with some of his friends across the street at a house on the corner of South Greenlawn Avenue and invited him to the party. Britiss testified that, later at the party, defendant asked the victim to sell him cannabis, the victim refused, and defendant immediately bought cannabis from someone else. She saw the victim pull out hundreds of dollars in cash from his pocket in front of defendant.

¶ 10        Britiss left the party and went for a walk. When she returned, she walked past defendant and the victim arguing on the front porch. Britiss witnessed defendant grab the victim

around his neck. The victim tried to get away but could not because he was being held by defendant. She heard a gunshot and saw the victim on the ground. She did not see who fired the gun. Britiss did not see the victim with a gun at any time during the party. When she went to the police station after the incident, Britiss identified defendant as the shooter from a photo lineup.

¶ 11                                        2. *Jasmine Burks*

¶ 12          Jasmine Burks, a relative of Britiss, testified, as she was walking into the house, she saw defendant and the victim arguing on the porch. She also saw defendant's girlfriend, Lakisha Hinkle, on the porch. Jasmine heard defendant say "[s]omething about some money." She went into the house for "no less [than] three or five seconds," and as she ran back out, she heard the victim say, "You're not going to get my money." Jasmine then saw defendant had a gun, and he shot the victim in the chest. When asked where defendant pulled the gun from, Jasmine indicated defendant did not pull the gun out from anywhere because "he already had the gun." Jasmine did not personally know the victim.

¶ 13          Jasmine admitted she initially gave police a false last name because she had an active warrant in a traffic case. She later served five days in jail for that case. She did not receive anything from the State in exchange for her testimony. Jasmine told the police she saw defendant shoot the victim. She identified defendant from a photo lineup. On cross-examination, Jasmine admitted, when she was speaking on a "jail line," she said that she did not see anything. She testified that she made that statement because she was scared.

¶ 14                                        3. *Tracina Jones*

¶ 15          Tracina Jones testified she was friends with defendant and the victim. Defendant complained to Jones that the victim was being funny about his cannabis and that "[the victim] was supposed to have weed and he would give nobody 2 for 15, wouldn't give nobody no play

for no weed or whatever." (Jones testified "2 for 15" meant two "loud blunts" containing quality cannabis, which generally sold for $10 each.) She stated the victim was not at the party to sell cannabis, but "[i]f somebody asked him, *** he sold it." She did not see the victim with "a big wad of cash," but she did see him give somebody change for a $20 bill. Jones also observed Hinkle carrying a Crown Royal bag at the party.

¶ 16       As Jones was walking out the front door, she saw defendant on the porch, and it appeared there "was this small little commotion going on, a little argument." Defendant and the victim were "more than an arm's length" from each other, "but not super far away." According to Jones, defendant "went to grab" the victim and the victim fell. Jones testified she did not see a gun in defendant's hand. She saw a flash from gunfire and defendant and the victim fell down. Defendant then got up and ran away. At the time the shooting occurred, Jones stated Hinkle and Breanna Kelly were inside the house.

¶ 17                                4. *Latisha Bailey*

¶ 18       Latisha Bailey testified she was playing cards in the dining room with Kelly and Angela Warfield. Hinkle was also in the room. Bailey saw Hinkle hand defendant a purple Crown Royal bag containing a small black gun.

¶ 19       Bailey saw defendant speaking with the victim twice in the living room and heard defendant say, "Something about two for 15." The victim responded he "wasn't going to keep giving out deals," and defendant walked back into the kitchen. Bailey testified she heard a gunshot approximately 45 to 90 seconds later. She immediately ran out to the porch and saw a man with a build similar to defendant running from the scene, and she fired shots at him. Bailey was on probation at the time she testified, but her probation status was not revealed to the jury.

¶ 20       On cross-examination, Bailey admitted she had given two to three different

- 4 -

versions of the events of the night of the shooting. She testified the State was not offering her a deal in exchange for her testimony relating to the discharge of her firearm at the scene. It was revealed to the jury that Bailey was convicted of felony forgery in 2009, felony manufacture and delivery of a controlled substance in 2009, and misdemeanor retail theft twice in 2005 and once in 2006.

¶ 21                                    5. *Warfield*

¶ 22        Warfield testified she was playing cards in the living room with Bailey and others. Hinkle was sitting in the chair next to Warfield. Hinkle was holding a Crown Royal bag in her hand. Defendant approached Hinkle, said, " 'Let me get that,' " and Hinkle handed him a black handgun from the bag. Warfield heard the shooting approximately two minutes later. She testified Hinkle and Kelly were in the living room at the time of the shooting. Warfield was familiar with defendant and had met the victim for the first time that night.

¶ 23                                 6. *Dr. John Denton*

¶ 24        Dr. John Denton, the forensic pathologist who performed the victim's autopsy, testified the victim had a gunshot wound mid-chest, about 15 inches from the top of the head in the midline. The entrance wound, which was slightly oval-shaped, was surrounded by a "rim of abrasion," which was "angled up towards [the victim's] right shoulder." According to Dr. Denton, this corresponded with the path of the bullet, which he determined to travel from "front to back, right to left, and fairly sharply downwards by about 11 inches." A 9-millimeter bullet was recovered from the victim's body. The victim also had smaller, superficial scrapes on the back of his elbow, forearm, and knee, which were consistent with collapsing after being shot. Dr. Denton did not find any bruising consistent with a struggle on the victim's body.

¶ 25        Dr. Denton stated there was no evidence of soot or gunpowder stippling on the

victim's T-shirt or the skin around the gunshot wound. Dr. Denton explained:

> "Usually, when I see evidence of close range firing, the distance of the muzzle to the skin or the outer layer of clothing is 2 feet or greater away. So if I do not see things that come out of the barrel with the bullet such as that cloud of smoke or soot or particles of gunpowder that come out burning or unburned gunpowder that are smaller projectiles, usually a muzzle that's within 2 feet of the entrance wound or the shirt, then I will see those particles or that smoke or soot. I did not see that on [the victim]."

Based on the lack of soot or stippling, Dr. Denton opined the gun was fired more than two feet from the victim's body.

¶ 26 The State asked whether the evidence supported a hypothetical situation where the victim pulled out a gun, the other individual grabbed the gun, and there was a struggle over the gun when it went off. Dr. Denton responded, "[T]he main thing that does not support that is the evidence of no close range firing, so there's no soot or stippling on the T-shirt or on the skin." He opined that "struggling over a gun [was] inconsistent with what [he] found." Dr. Denton indicated that knowing the muzzle had to be two feet away and knowing the trajectory of the bullet, the gun would have had to been fired up by the ceiling to achieve the angle of the bullet that traveled through the victim's body if they were in a physical struggle over the gun. He indicated the trajectory of the bullet was also consistent with the victim attempting to duck and run away.

¶ 27 On cross-examination, Dr. Denton testified it was possible that if a weapon was extremely clean, there might be no evidence of soot or stippling if the gun was fired within 24 inches but at least 18 inches from the body or clothing. He agreed the trajectory of the bullet

could have happened if the victim was sitting on the ground, "but, again, the muzzle [had] to be 2 feet away." Dr. Denton indicated a gun fired with medium caliber ammunition would require the muzzle to be within "about 2 feet to see close range firing."

¶ 28                                    7. *Hinkle*

¶ 29            Hinkle testified she had been dating defendant for around five years. Hinkle described the victim's demeanor the night of the party as, "[l]oud, obnoxious, *** he seemed a little highly intoxicated." Hinkle denied giving defendant a Crown Royal bag with a gun in it. Hinkle testified, when she was standing on the porch, she saw the victim go across the street to a house on the corner of South Greenlawn Avenue. The victim quickly returned to the party with his hand in his pocket. The victim approached defendant on the porch. Defendant said to the victim, "You all right, little dude? Woo woo." According to Hinkle, the victim "just snapped out" and said, "F you, n***." The victim pulled a gun from his pocket. Defendant and the victim wrestled over the gun and a gunshot went off.

¶ 30                                    8. *Kelly*

¶ 31            Kelly, Hinkle's sister, testified that she saw the victim go to a house "[c]atty-corner by the stop sign" prior to the shooting. When he returned, the victim seemed "kind of angry" and had his hands in his pockets. According to Kelly, she and Hinkle were on the porch when Kelly saw the victim pull out a gun. Kelly watched as the victim and defendant got into a "tussle" over the gun. She then heard a loud "pop" and saw the victim hit the ground. She testified she never saw a Crown Royal bag with a gun in it. On cross-examination, Kelly denied telling police she saw the victim retrieve something from a car, rather than a house, prior to the shooting. She acknowledged her initials on a document depicting an "X" in the street to indicate where the car was located, but she denied having made the "X" during the police

interview.

¶ 32                                    9. *Defendant*

¶ 33          Defendant testified the first time he met the victim was at the party. He and the victim bumped into each other and briefly argued. He recalled the victim was "being extremely mouthy" to him. When defendant was outside on the porch, he saw the victim leave the party and go into a house across the street. Defendant later saw the victim exit the house and walk back toward the party carrying what he believed to be a gun. The victim confronted defendant on the porch and pulled out a gun. They struggled over the gun, and it went off. Defendant testified Hinkle and Kelly were standing on the sidewalk out front when the shooting occurred.

¶ 34          Defendant admitted he ran away after the shooting and broke into an abandoned building, where he was "laying low." He testified that he burned the clothes he was wearing and kicked them down a sewer. He also admitted that he cut his hair before turning himself in to the police. During his police interview, defendant indicated he saw the victim go across the street from the party to a house with an enclosed porch and retrieve a gun.

¶ 35                                   10. *Linda Thomas*

¶ 36          Linda Thomas testified as a rebuttal witness for the State. Thomas testified that she lived at 816 South Greenlawn Avenue, the house that defendant told police he saw the victim enter to retrieve a gun. On the night of the party, Thomas locked both her front door and the door to her enclosed front porch before going to bed. She did not unlock the doors until she heard police knocking after the shooting. Thomas indicated she did not know the victim, and there was no reason he would ever be in her home.

¶ 37                                  11. *Laharold Washington*

¶ 38          Laharold Washington, a jailhouse informant, also testified as a rebuttal witness

for the State. He was serving a three-year sentence at the time he testified. Washington claimed he spoke with defendant about the incident when the two men were in jail together. Washington testified that defendant told him that he pulled a gun and shot the victim when the victim lunged at him during an argument. When Washington asked him what he was going to do about the case, defendant responded he would say the victim pulled out the gun, the two tussled over it, and the gun went off.

¶ 39    Washington testified the State dismissed "one case of unlawful possession of a controlled substance" in exchange for his testimony in defendant's case. However, at the time Washington came forward, he was charged with four drug offenses in two separate cases. He pleaded guilty to one of the charges, but the other three, including the two most serious charges, were dropped. Trial counsel did not correct Washington on cross-examination and did not explain to the jury that the two most serious charges were dropped.

¶ 40    The jury convicted defendant of first degree murder.

¶ 41        B. Sentencing and Direct Appeal

¶ 42    The trial court sentenced defendant to 50 years' imprisonment. Defendant appealed, and the appellate court affirmed his conviction and sentence on direct appeal. *Walls*, 2017 IL App (3d) 150481-U, ¶ 130.

¶ 43        C. Postconviction Proceedings

¶ 44    In December 2018, defendant filed a *pro se* postconviction petition. Relevant here, defendant alleged trial counsel provided ineffective assistance by failing to (1) impeach Dr. Denton with a 2006 article he coauthored on gunshot wounds, (2) impeach Bailey with the fact she was on probation at the time of trial, and (3) investigate whether the victim had a connection to 818 South Greenlawn Avenue, the house Hinkle told police she saw the victim enter shortly

before the shooting.

¶ 45　　　　In March 2019, the trial court summarily dismissed the petition as frivolous and patently without merit. Defendant appealed, and the appellate court found the trial court erred in dismissing the petition, as defendant adequately stated the gist of a constitutional claim. *Walls*, 2023 IL App (3d) 190178-U, ¶ 45. The appellate court reversed the dismissal and remanded for second-stage proceedings. *Walls*, 2023 IL App (3d) 190178-U, ¶ 50.

¶ 46　　　　On remand, the trial court appointed postconviction counsel to represent defendant. In January 2024, counsel filed an amended postconviction petition. The amended petition incorporated by reference the assertions and arguments from the *pro se* petition. The amended petition realleged trial counsel was ineffective for failing to impeach Dr. Denton with the 2006 article and Bailey with her probation status. Postconviction counsel added a new claim of ineffective assistance of counsel for failing to impeach Washington with the full details of his plea agreement in exchange for his testimony at defendant's trial. The State subsequently filed a motion to dismiss the amended petition.

¶ 47　　　　In August 2024, the trial court conducted a second-stage hearing. Following the arguments of the parties, the court took the matter under advisement.

¶ 48　　　　In September 2024, the trial court entered a written order dismissing the amended petition. The court found trial counsel "aggressively challenged" Dr. Denton's opinions. The court further found the allegations relating to the failure to investigate and the failure to impeach did "not pass 2nd stage muster."

¶ 49　　　　This appeal followed.

¶ 50　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 51　　　　On appeal, defendant argues the trial court erred by dismissing his amended

petition at the second stage of postconviction proceedings because the petition made a substantial showing of ineffective assistance of trial counsel.

¶ 52 The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2024)) provides a three-stage process in which criminal defendants may challenge their convictions or sentences based on a substantial violation of their federal or state constitutional rights. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). At the first stage, the trial court independently reviews the petition to determine whether it "is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2024). If the petition is not dismissed, the court advances the petition to the second stage. See 725 ILCS 5/122-2.1(b) (West 2024).

¶ 53 Once a petition moves to the second stage, the trial court may appoint counsel to represent the defendant and the State may answer the petition or file a motion to dismiss. *People v. House*, 2021 IL 125124, ¶ 17. At this stage, the court determines "whether the postconviction petition and any accompanying documentation make a substantial showing of a constitutional violation." *House*, 2021 IL 125124, ¶ 17. The court does not engage in any fact-finding or credibility determinations. *Coleman*, 183 Ill. 2d 366, 385 (1998). Instead, all well-pleaded facts that are not affirmatively rebutted by the record are taken as true. *People v. Domagala*, 2013 IL 113688, ¶ 35. If defendant makes a substantial showing of a constitutional violation, the petition proceeds to the third stage for an evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 54 In this case, the State filed a motion to dismiss, and the trial court dismissed the amended petition. We review *de novo* the court's dismissal of a postconviction petition at the second stage of proceedings. *People v. Carroll*, 2024 IL App (4th) 231207, ¶ 48.

¶ 55 A. Ineffective Assistance of Counsel

¶ 56 Defendant alleges the petition made a substantial showing that trial counsel

- 11 -

rendered ineffective assistance by failing to (1) impeach Dr. Denton with a 2006 article he coauthored, (2) impeach Bailey with her probation status, (3) impeach Washington with the details of his plea agreement, and (4) investigate the victim's connection to 818 South Greenlawn Avenue.

¶ 57    The sixth amendment of the United States Constitution and article I, section 8 of the Illinois Constitution guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel are governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard). To prevail on a claim of ineffective assistance, a defendant must first show deficient performance, meaning that counsel's conduct "fell below an objective standard of reasonableness." *People v. Campbell*, 332 Ill. App. 3d 721, 728 (2002). Second, a defendant must demonstrate prejudice, meaning that "there is a 'reasonable probability that, but for counsel's unprofessional errors,' " the result of the trial would have been different. *Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). Failure to satisfy either prong defeats a claim of ineffective assistance. *Campbell*, 332 Ill. App. 3d at 728.

¶ 58                    1. *Failure to Impeach*

¶ 59    Defendant asserts his petition made a substantial showing that trial counsel was ineffective for failing to confront Dr. Denton with a 2006 article he coauthored. Generally, the decision whether to impeach a witness is a matter of trial strategy that will not support a claim of ineffective assistance of counsel. *Campbell*, 332 Ill. App. 3d at 730. This court strongly presumes that counsel's action or inaction was the product of sound trial strategy. *People v. Vera*, 277 Ill. App. 3d 130, 138 (1995). "[N]either mistakes in strategy nor the fact that another

- 12 -

attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent." *Vera*, 277 Ill. App. 3d at 138.

¶ 60　　　　　Dr. Denton's 2006 article, titled "Practical Pathology of Gunshot Wounds," states, in relevant part:

"The principle [*sic*] indicator of close range fire is stippling, that is, a pattern of tiny, punctuate abrasions in the skin surrounding the entrance wound. *** The presence of stippling indicates that the muzzle of the gun was within 2 feet of the victim's body when it was discharged. Contact range firing occurs when the muzzle of the gun is in contact with the skin at the time of discharge. *** These wounds are often characterized by a dense pattern of combusted gunpowder residue or soot within and around the wound margin. *** A muzzle imprint is not an uncommon finding and is virtually pathognomonic of a contact range gunshot wound. As noted earlier, stellate patterns of tearing, especially over bony surfaces, are not unusual.

Distant range gunshot wounds, that is, wounds inflicted when the muzzle of the gun is more that [*sic*] 2 feet away, will show no evidence of soot or stippling. It is absolutely critical that the forensic pathologist recognizes that the absence of soot or stippling does not absolutely mean that the wound [*sic*] was not fired from close range. Intermediate targets and clothing can screen out stippling and soot even when the muzzle of the gun is pressed up against the clothing." J. Scott Denton, MD; Adrienne Segovia, MD; James A. Filkins, MD, JD, PhD, *Practical Pathology of Gunshot Wounds*, 130 Archives of Pathology & Laboratory Medicine 1283, 1286 (September 2006) (hereinafter *Pathology of*

*Gunshot Wounds*).

¶ 61  At trial, Dr. Denton opined the gun was fired more than two feet away from the victim due to the absence of soot or stippling on the victim's body or clothing. He testified "the main thing" that did not support a struggle over the gun was the lack of evidence of close-range firing. He testified the angle of the entry wound, the trajectory of the bullet, and the lack of bruising on the victim's body also indicated there was no struggle over the gun.

¶ 62  The record demonstrates trial counsel's cross-examination of Dr. Denton on this issue was not deficient, as counsel vigorously questioned Dr. Denton's opinion that the gun was fired from at least two feet away. In fact, Dr. Denton eventually agreed with counsel that it was possible the gun could have been fired between 18 and 24 inches from the victim. Counsel also elicited testimony from Dr. Denton that, assuming certain conditions, the gun could have been fired during a struggle with the victim.

¶ 63  Even assuming, *arguendo*, that counsel's performance was deficient, defendant has not demonstrated he was prejudiced. A full reading of the article reveals it supported Dr. Denton's testimony. The article states the "principle [*sic*] indicator" of close range firing is soot or stippling, but the absence of soot or stippling is not conclusive evidence that it was not. *Pathology of Gunshot Wounds*, *supra*, at 1286. In those instances, the article encourages pathologists to consider intermediate targets, such as clothing. At trial, Dr. Denton testified he did just that—he examined the victim's body and then examined an intermediate target—in this case, the victim's T-shirt. He was also careful to qualify that soot and stippling is "usually" present in close-range firing. Dr. Denton then concluded a struggle over the gun was inconsistent with what he found. He relied on several items of evidence other than the lack of soot or stippling to support this conclusion, including the angle of the entry wound, the trajectory of the

- 14 -

bullet, and the lack of any bruising that would indicate a struggle. Thus, defendant failed to show the outcome of the trial would have been different had counsel attempted to impeach Dr. Denton with the 2006 article.

¶ 64　Defendant next contends the petition made a substantial showing that trial counsel was ineffective for failing to impeach Bailey with the fact she was on probation at the time she testified. Because the decision whether to impeach is almost always immune from ineffective assistance claims, a defendant cannot establish deficient performance unless he can demonstrate counsel completely failed to use significant impeachment evidence. *People v. Salgado*, 263 Ill App. 3d 238, 246-47 (1994). "[A] court of review will not upset a verdict by a jury on the possibility, not probability, that with a little bit more impeachment, the witness would have been found totally incredible." *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 47.

¶ 65　At defendant's trial, counsel extensively cross-examined Bailey and impeached her credibility in three ways. First, counsel elicited that Bailey gave two or three different versions of the events at the party. Second, Bailey admitted she fired her own gun on the night of the shooting and the State had not charged her or offered her a deal relating to that conduct. Third, counsel impeached Bailey with her convictions for felony forgery in 2009, felony manufacture and delivery of a controlled substance in 2009, and misdemeanor retail theft twice in 2005 and once in 2006. Thus, counsel thoroughly impeached Bailey and called into question her credibility based on her changing stories and criminal conduct. See *People v. Costic*, 2025 IL App (4th) 241041-U, ¶ 101 ("A defendant cannot make a substantial showing of ineffective assistance of counsel by noting counsel's failure to impeach a witness more.").

¶ 66　Even if we were to conclude trial counsel's failure to impeach Bailey with her probation status was objectively unreasonable, defendant has not demonstrated he was

prejudiced. Although defendant insists otherwise, Bailey was not the only witness to provide a motive for defendant to shoot the victim, namely, a disagreement over a cannabis transaction. Britiss testified that she witnessed the victim refuse to sell cannabis to defendant, and Jones testified that defendant complained to her that the victim wouldn't sell him "2 for 15, wouldn't give nobody no play for no weed." Additionally, Bailey was not the only witness who testified Hinkle and Kelly were inside the house, and not on the porch as they had claimed, at the time of the shooting. Warfield and Jones, who did not have any similar credibility issues, testified to Hinkle and Kelly's presence inside the house when the shooting took place. Thus, Bailey's testimony, while helpful, was unnecessary to establish a motive or to discredit Hinkle and Kelly.

¶ 67    Finally, defendant argues the petition made a substantial showing that trial counsel was ineffective for failing to elicit testimony concerning the full details of Washington's agreement with the State. Specifically, he contends counsel should have made the jury aware of two felony unlawful manufacturing and delivery charges against Washington, which the State dismissed in exchange for his testimony. Defendant's argument essentially amounts to the same argument he put forth as to Bailey—that Washington was "not impeached enough." See *Campbell*, 332 Ill. App. 3d at 730. In this case, the State had already elicited testimony from Washington that he was in jail when he spoke with defendant, the State was dropping a drug-related case against him in exchange for his testimony, and he was incarcerated at the time he testified. The jury was thus fully aware of Washington's potential bias and incentive to implicate defendant in the shooting.

¶ 68    Accordingly, defendant's allegations fail to make a substantial showing of ineffective assistance of trial counsel based on the failure to impeach, and the trial court properly dismissed these claims.

¶ 69                                    2. *Failure to Investigate*

¶ 70        Defendant next argues the petition made a substantial showing that trial counsel was ineffective for failing to investigate whether the victim had a connection to 818 South Greenlawn Avenue, the house that Hinkle told police she saw the victim enter prior to the shooting. Specifically, he alleges counsel failed to discover that the victim was Facebook friends with one of the residents of 818 South Greenlawn Avenue, Willie Breedlove, a known gang member who was linked to a March 2012 exchange of gunfire with a rival gang. In support of this claim, defendant attached to his *pro se* petition a screenshot of Breedlove's Facebook friends list and three news articles describing instances of Breedlove being involved in various drug and firearm offenses. One of the articles, dated April 9, 2015, stated that Breedlove was sentenced to 22 months in federal prison after spending more than a year in custody.

¶ 71        "Trial counsel has a professional duty to conduct 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *Domagala*, 2013 IL 113688, ¶ 38 (quoting *Strickland*, 466 U.S. at 691). Whether trial counsel was ineffective for failing to investigate is determined by the value of the evidence that was not presented at trial and the closeness of the evidence at trial. *People v. Jarnagan*, 154 Ill. App. 3d 187, 194 (1987). "Attorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *People v. Morris*, 335 Ill. App. 3d 70, 79 (2002). "A strong presumption exists that trial counsel acted effectively in investigating a case." *People v. Brown*, 2017 IL App (1st) 150203, ¶ 29.

¶ 72        On this record, defendant cannot make a substantial showing of ineffectiveness based on counsel's purported failure to investigate. First, defendant has not overcome the strong presumption that counsel's performance was the result of reasonable trial strategy. By

investigating and presenting this evidence, counsel risked confusing the jury and highlighting the inconsistencies of the defense witnesses on where the victim allegedly retrieved the gun. Second, even taking all well-pleaded facts in the petition as true, the tenuous connection between 818 South Greenlawn Avenue and the victim would have been of little, if any, value to defendant's case. See *Jarnagan*, 154 Ill. App. 3d at 194. Beyond the fact they were Facebook friends, the *pro se* petition entirely fails to allege any facts concerning the extent of the alleged relationship between Breedlove and the victim. Further, it is equally unclear, based on the April 2015 article attached to the *pro se* petition, whether Breedlove was even residing at 818 South Greenlawn Avenue at the time of the shooting, as the article appeared to indicate he was in federal custody.

¶ 73     Ultimately, the evidence presented at trial overwhelmingly implicated defendant in the shooting. Britiss and Bailey saw the victim refuse to sell cannabis to defendant. Defendant complained to Jones about the victim refusing to sell him cannabis. Bailey and Warfield witnessed Hinkle giving defendant a gun in a purple Crown Royal bag. Jones also observed Hinkle carrying a Crown Royal bag at the party. Bailey, Warfield, and Jones testified Hinkle and Kelly were inside the house when the shooting occurred and not outside as they had claimed. Defendant described the victim as being "mouthy" toward him during the party and acknowledged they had a brief argument. Jones confirmed that defendant and the victim were standing more than an arm's length away from each other when the shooting occurred. Jasmine saw defendant shoot the victim in the chest. Britiss and Jasmine identified defendant as the shooter in a police photo lineup. Dr. Denton opined the gun was fired at least 18 to 24 inches away from the victim based on the lack of stippling or soot on the body or clothing. He also concluded a struggle over the gun was inconsistent with the angle of the entry wound, the trajectory of the bullet, and the absence of bruising on the victim's body. Washington testified

defendant admitted to pulling out the gun and shooting the victim. Washington also indicated defendant said he would claim self-defense and say that the victim pulled out the gun and the gun went off during a struggle over the weapon. Defendant, Hinkle, and Kelly told the police the victim walked across the street prior to the shooting, but each identified a different location from which he allegedly retrieved the gun. Defendant admitted to fleeing the scene, hiding out in an abandoned building, burning and disposing of his clothing, and cutting his hair before turning himself in to the police. See *People v. Moore*, 2015 IL App (1st) 140051, ¶ 26 ("Evidence of flight is admissible as tending to demonstrate a defendant's consciousness of guilt."); *People v. Abernathy*, 402 Ill. App. 3d 736, 753 (2010) ("Evidence that the accused has attempted to destroy evidence against himself is always admissible for the purpose of showing consciousness of guilt." (Internal quotation marks omitted.)); *People v. Velez*, 2012 IL App (1st) 101325, ¶ 35 (finding the defendant's act of shaving his goatee before turning himself in to the police was admissible as evidence of an attempt to avoid identification as the perpetrator).

¶ 74        Accordingly, defendant has failed to make a substantial showing he was denied the effective assistance of counsel based on the failure to investigate.

¶ 75                                B. Cumulative Prejudice

¶ 76        Finally, defendant argues he made a substantial showing that he was prejudiced by the cumulative effect of counsel's errors, depriving him of a fair trial. Having individually reviewed and rejected each claim of ineffective assistance of counsel, his cumulative prejudice claim must necessarily fail. Therefore, a cumulative prejudice analysis is unnecessary.

¶ 77                                III. CONCLUSION

¶ 78        For the reasons stated, we affirm the trial court's judgment.

¶ 79        Affirmed.